## COMMONWEALTH vs. SOLANGE ANESTAL.

Plymouth. January 9, 2012. - November 6, 2012.

Present: IRELAND, C.J., BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Evidence,* Prior misconduct, Expert opinion, Cross-examination, Self-defense. *Witness,* Expert, Cross-examination. *Self-Defense. Practice, Criminal,* Instructions to jury. *Battered Woman Syndrome.*

At a murder trial, although the judge did not abuse his discretion in permitting the Commonwealth to introduce limited evidence of a prior bad act by the defendant (i.e., the fact that a Department of Social Services [DSS] complaint had been brought against her) for the purpose of rebutting a suggestion made by defense counsel in his opening statement [663-666], the judge erred in admitting details of that complaint, as well as details of an earlier, unrelated allegation that the defendant had abused her child, where the information, which was known to the expert witness, did not form the basis of her opinion, did nothing to clarify or discredit her opinion, and served only to focus on the defendant's prior bad acts [666-671]; moreover, the judge also erred in admitting the testimony of two subsequent witnesses regarding the details of the complaint [671-672].

At a murder trial, the judge erred in declining to instruct the jury on excessive use of force in self-defense, where, assessing the reasonableness of the defendant's fear in light of her history of abuse, as called for by G. L. c. 233, § 23F, it could not be said, viewing the evidence in the light most favorable to the defendant, that the matter should have been removed from the province of the jury. [674-679]

This court concluded that, when considered together, the erroneous admission at a murder trial of highly prejudicial evidence of the defendant's prior bad acts and the judge's erroneously declining to provide a jury instruction on the excessive use of force in self-defense (which was supported by the evidence) required a new trial. [672-674]

INDICTMENT found and returned in the Superior Court Department on August 15, 2003.

The case was tried before *Richard J. Chin,* J., and a motion for a new trial, filed March 29, 2010, was heard by him.

*Robert F. Shaw, Jr.,* for the defendant.

*Robert C. Thompson,* Assistant District Attorney (*Sharon E. Donatelle,* Assistant District Attorney, with him) for the Commonwealth.

LENK, J. The defendant was convicted by a Superior Court jury of murder in the first degree on a theory of deliberate premeditation in the 2003 stabbing death of her boy friend, Baby Petitry. Before us are the defendant's consolidated appeals from both her conviction and the denial of her motion for a new trial. We conclude that, because on multiple occasions, over objection, the trial judge erroneously allowed the Commonwealth to introduce highly prejudicial evidence of the defendant's prior bad acts, and because the judge later declined to provide an instruction as to the excessive use of force in self-defense that was supported by the evidence, the conviction must be reversed and the matter remanded for a new trial.

1. *Background.* a. *The Commonwealth's case-in-chief.* We recite the facts as the jury could have found them, reserving certain details for later discussion.

On June 26, 2003, the defendant and Petitry lived together in an apartment in Brockton. Goudy Richemond, a friend of Petitry, was at their apartment repairing a broken baby crib. One of Richemond's friends, Ivens Fouyolle, was also present at the apartment. The defendant's and Petitry's infant daughter and the defendant's son, who was around "five or six years old," ordinarily would have been home, but the children had been taken into custody by the Department of Social Services (DSS)[1] eight days earlier because of a complaint against the defendant.[2]

About ten to twenty minutes after Fouyolle arrived at the apartment, the defendant said that she was leaving to spend the evening out with friends. Petitry refused to let her go, saying that a DSS investigator would be coming the following day to discuss the removal of the children and that he did not want her to spend the night out with other men smoking marijuana. An argument ensued. The defendant made a telephone call and said that Petitry was treating her like a "slave," and according to Fouyolle, Petitry's "tone of voice was like she's not going out, like, you know, he's telling his woman that she's not going out, and he means it."

---

[1]Effective July 8, 2008, the Department of Social Services (DSS) is now the Department of Children and Families. See G. L. c. 18B, § 1, as amended by St. 2008, c. 176, § 25.

[2]This complaint and its details will be discussed as it relates to the defendant's first claim of error. See *infra.*

The three men — Petitry, Richemond, and Fouyolle — then went downstairs to smoke cigarettes. From where they were smoking, they could still hear the defendant on the telephone, saying she was a "slave" and that Petitry thought he "own[ed]" her. While Richemond and Fouyolle continued smoking, Petitry went back upstairs.

By the time all three men had returned to the apartment, Petitry had threatened to move out and had started packing his belongings. The pair continued to argue, shutting the bedroom door so Fouyolle and Richemond could not overhear. Through the door, Fouyolle could still make out arguing and swearing, including the defendant saying that Petitry was not leaving her. At some point during the argument, Richemond felt the need to open the door, telling Petitry to "relax" because "[t]he people downstairs [are] going to call the cops." With the door opened, Fouyolle could see that Petitry was positioned on top of the defendant, holding her down on the bed. She was spitting in Petitry's face, telling him to move. Petitry told the men to "mind [their] fucking business" and Richemond closed the door.

Soon thereafter, Fouyolle heard a sound of breaking glass. The argument continued. When Petitry later left the bedroom,[3] the defendant followed "[n]ot even ten seconds" later, holding a sixteen-inch piece of glass. On her way out the door, the defendant said, "[M]other fucker, I'm going to kill you,"[4] and proceeded to stab Petitry in the chest. The glass entered Petitry's chest under the left mid-collarbone and penetrated four and one-half inches into his left lung. Once Petitry started to bleed, the defendant appeared shocked, pleading, "[D]on't die, please don't die." Fouyolle immediately called the police.

When the police arrived at approximately 10:40 P.M., they found the defendant visibly upset, "shaking and crying." When paramedics stated that they would cease cardiopulmonary resuscitation, the defendant started to thrash uncontrollably; she slammed her head against the wall and headboard of the bed

---

[3]There was some evidence that Petitry closed the door behind him and held it closed momentarily so the defendant could not leave the room.

[4]As brought out in cross-examination, Fouyolle testified differently at the grand jury; he did not indicate at that time that the defendant made this statement as she was leaving the bedroom.

and screamed that "if [Petitry] dies, [I] want[] to die." Petitry's heart stopped before the paramedics could get him out of the apartment.

b. *The defendant's claimed lack of criminal responsibility.* The defendant largely conceded the sequence of events but argued that she was not criminally responsible for her actions because, due to a mental disease or defect — specifically post-traumatic stress disorder (PTSD) resulting from years of physical and emotional abuse — she lacked the substantial capacity at the time of the stabbing both to appreciate the wrongfulness of her conduct and to conform her conduct to the requirements of the law. See *Commonwealth* v. *McHoul,* 352 Mass. 544, 546-547 (1967). In support of this claim, the defense offered the testimony of two expert witnesses; the Commonwealth did the same in response.[5]

The evidence admitted at trial indicated that the defendant suffered from a long history of abuse.[6] Born in Haiti in 1980, she was one year old when her father left her family. During her early childhood, she lived with her mother and stepfather; "[t]here was abuse all through that period." At the age of ten, she left Haiti to come to the United States. When she arrived, she lived in a number of shelters before her father was located and she was placed with him in Florida. Her father's wife, with whom she also lived, was physically abusive toward her. At the age of fourteen, someone in the defendant's neighborhood sexually assaulted her. After her father's death in 1996, she went to live with her aunt and uncle, where she encountered another abusive household.

While she was living in Florida, she became involved with a man, Claudel Gellete, who would become the father of her first child, a son. Her relationship with Gellete was marked by

---

[5]Because "the effects of posttraumatic stress disorder, or battered woman syndrome, are [not] within the common experience of the ordinary juror," *Commonwealth* v. *Crawford,* 429 Mass. 60, 67 (1999), we allow expert testimony on this subject. See, e.g., *Commonwealth* v. *Pike,* 431 Mass. 212, 221-222 (2000). See also G. L. c. 233, § 23F (*b*).

[6]The entirety of the defendant's history of abuse was admitted through expert testimony, primarily that of Dr. Ann Burgess. None of the police, hospital, or psychiatric records referenced in that testimony were separately admitted in evidence.

violence. Police reports from Florida, dated September, 1998, indicate that, on one occasion, officers noticed broken blood vessels in her eyes, as well as swelling and bruising around her face. She told the officers that Gellete had caused the injuries by punching her multiple times. Florida hospital records indicate that, seven months later, in April, 1999, the defendant was hit over the head by a beer bottle so hard that it caused the skin on her scalp to split apart, requiring staples to repair the damage. On that trip to the hospital, she reported that she did not know where she was. She returned to the hospital yet again, complaining of pain in her stomach and reporting that Gellete had hit her. She also reported that she suffered black eyes and migraine headaches from his beatings. According to these reports, he had also threatened to kill her.

After her relationship with Gellete ended, the defendant moved to Massachusetts. In 2001, the defendant was hospitalized after a suicide attempt and was diagnosed with major depression. While living in Massachusetts, she began a relationship with a man named John Colson. According to the defendant, Colson too was abusive — the defendant described this relationship as "like being in hell" — particularly when he was drinking or smoking marijuana. The abuse was so extreme that the defendant and her son moved into a shelter hotel in June, 2002, to get away from him. When Colson tracked her down at the shelter, he attempted to suffocate her with a pillow. During this attack, the defendant suffered swollen temples and cheeks, as well as having a mole bitten off the side of her head.

After this incident, from "June 2002 into July 2002," the defendant sought counselling at New Bedford Child and Family Services and was diagnosed with major depression and PTSD. She described herself as depressed, irritable, and prone to angry outbursts. The same diagnoses were later made at South Bay Mental Health Center (South Bay), where she was treated for several months beginning in July, 2002. At the time of this diagnosis, the defendant was also reported to have made bizarre statements to mental health professionals, including that she believed she would become president of Haiti before she turned thirty years old, and that she had been baptized by the Pope himself. Clinicians at South Bay continued to treat her, describing

the defendant as "very depressed" before the birth of her daughter, "tired and stressed" after the birth, and increasingly stressed by the defiant behavior of her son.[7] While being treated at South Bay, the defendant was "on low doses of antidepressants intermittently," which she ceased during her pregnancy and did not resume until after the date of the stabbing.[8]

After she began dating Petitry, apparently in mid to late 2002, the defendant described herself as "helpless and powerless" in the relationship. The defendant stated that his abuse was primarily verbal but that he would punch her repeatedly on occasion. She reported that he would become "aggressive and verbally abusive" when he was drinking.[9] A police report stated that, on one occasion, in April, 2003, several months before the stabbing, the defendant had called the police because Petitry had been abusive, and "it took the police to get him out of the house." Attorney Thomas D. Lawton testified that, in the course of representing the defendant in the Juvenile Court in relation to the complaint filed by DSS, he witnessed an incident on June 23, 2003 (three days before the stabbing), in which Petitry stood over the defendant with his fists clenched, cursing and screaming that he was going to kill her. With Petitry standing over her in an "assaultive position," the defendant "leaned over with her face ti[lt]ed away from [Petitry] with tears pouring off her nose and her lip." When Lawton intervened, Petitry told the defendant to "keep her mouth shut and watch what she said." The defendant, who was "crying" and "shaking" even after she had been moved away from Petitry, refused Lawton's offer to help her obtain a restraining order against Petitry, telling Lawton that if she did so, Petitry would kill her.

As to the circumstances of the stabbing itself, although the defendant remembered the moments immediately before and after the incident, she claimed to have no memory of inflicting

---

[7] At the time of the stabbing, the defendant's son was "very hyperactive" and exhibited "defiant behavior."

[8] According to Burgess's testimony, the defendant was still breast feeding her daughter at the time of the stabbing and was not taking the medication because "medicines can go to the baby" through the breast-feeding process.

[9] A postmortem toxicology report put Petitry's blood alcohol content at .154 per cent at the time of his death, almost twice the legal limit for lawful operation of a motor vehicle on a public way. See G. L. c. 90, § 24 (1) (a) (1).

the blow. The next day, the defendant was admitted to Taunton State Hospital, by court order, for a thirty-day evaluation of her competency; she was determined to be competent.

Dr. Ann Burgess, a registered and advance practice nurse with a doctorate in nursing, testified that, based upon her evaluation of the defendant and her review of the defendant's history, she believed that the defendant lacked criminal responsibility at the time of the stabbing because of her diagnosed PTSD. Burgess described Petitry as "aggressive," "abusive," and "controlling" in his relationship with the defendant, as evidenced by, among other things, the instances of his physical and verbal abuse, his forcing her to have sexual intercourse soon after the birth of their daughter, and his "insist[ing]" that she accompany him on a trip to New York when she was "within days of her due date." Burgess also testified that she believed the defendant was suffering from postpartum depression at the time,[10] in addition to her previously diagnosed depression and PTSD. She opined that, during the stabbing, the defendant was in the midst of a posttraumatic stress reaction to the circumstances of the argument. The fact that the defendant did not remember the stabbing itself was indicative of a PTSD reaction to the circumstances of the argument. According to Burgess, the defendant left the bedroom because of "the fear and needing to get away from the noxious environment" and to avoid feeling like she was being held "captive." She picked up the piece of glass because "she thought somebody was going to come after her" so it "could [have been] an automatic reaction to have that in her hand." Overall, "her mental level was far below what would be needed to think clearly about [the] situation."

Dr. Terence Keane, a professor of psychiatry and psychology at Boston University School of Medicine, similarly testified that he believed the defendant lacked criminal responsibility because of her PTSD. Keane testified that, at the time of the stabbing, the defendant was suffering from PTSD "accompanied by a dissociative reaction" and was in a "dissociative state." According to Keane, when an individual is in a dissociative state, "there's a lack of appreciation of the events . . . and there's a

---

[10]The defendant's daughter was born on May 18, 2003, approximately five weeks before the stabbing.

real compromise of what is happening in reality." When Petitry was on top of the defendant, that may have reminded her of the previous attack by Colson, which could have acted as a "key trigger," provoking similar emotions from that earlier incident and leading to her dissociative state on this occasion. The defendant's statements in the immediate aftermath indicated that the stabbing had "shock[ed her] into [an] awakened state . . . reinstating the true reality of what's just happened."

In response, the Commonwealth called Dr. Michael Murphy, a psychologist at Taunton State Hospital and director of psychology at the Barnstable County sheriff's office. According to Murphy, the defendant was criminally responsible for her acts because "she did not display active symptoms of a major mental illness." Murphy based this opinion, in part, on her mannerisms during their interviews, which indicated that she was not experiencing either depressive or psychotic symptoms. The defendant was also well oriented during the interviews, in that she knew where she was, the date and time, and the reason why she was there. Murphy stated that, during the defendant's stay at Taunton State Hospital after the stabbing, she had displayed no signs or symptoms of PTSD.[11]

Dr. Russell Vasile, a staff psychiatrist at Beth Israel Deaconess Medical Center, testified that, based on a mental status examination conducted in July and August, 2006, the defendant "was not suffering from a major thought disorder" or a "major active mental illness" at the time of the stabbing. According to Vasile, despite the earlier diagnosis, the defendant did not suffer from PTSD and was not in a dissociative state at the time of the 2003 stabbing. In addition, Vasile testified that the defendant had the substantial capacity to appreciate the wrongfulness of her conduct and had the capacity to conform her conduct to the requirements of the law.

On September 27, 2007, the jury found the defendant guilty of murder in the first degree on a theory of deliberate pre-

---

[11]The jury heard during defense counsel's cross-examination of Dr. Michael Murphy that another doctor at Taunton State Hospital, who did not testify at trial, diagnosed the defendant with posttraumatic stress disorder (PTSD). On her arrival at the hospital, the defendant said that she wanted to die, was placed on twenty-four hour watch, asked a staff member to kill her, and began taking antidepressants.

meditation. After her direct appeal was entered before this court in November, 2009, the court granted a stay of the appeal to allow the defendant to file a motion for a new trial. In November, 2010, the defendant's motion for a new trial was denied following a nonevidentiary hearing. The defendant's appeal from that denial was consolidated with her direct appeal.

2. *Discussion.* The defendant claims reversible error in four respects. First, she argues that the trial judge erred in admitting, on multiple occasions, prejudicial prior bad act evidence concerning two occasions on which she allegedly had struck her young son. Second, the defendant argues that the judge erred in declining to give a sought instruction as to the excessive use of force in self-defense, which mitigates murder to voluntary manslaughter. Third, the defendant maintains that the judge's instructions regarding reasonable provocation were insufficient to convey the extent to which the jury could consider the defendant's history of past abuse. Lastly, she argues that the judge erred in denying her motion for a new trial. In that motion, the defendant claimed both prosecutorial misconduct and ineffective assistance of counsel concerning the alleged existence of a second door in the bedroom through which the defendant could have fled.

We conclude that the improper admission on multiple occasions of prior bad act evidence, in combination with the refusal to instruct the jury as to the excessive use of force in self-defense, were prejudicial errors requiring a new trial.[12]

a. *Evidence of prior bad acts.* The defendant maintains that she was prejudiced by the repeated admission in evidence of

---

[12]Given our disposition, we need not address the defendant's remaining claims of trial error, or her request that we enter an order reducing the verdict to a lesser degree of guilt pursuant to our power under G. L. c. 278, § 33E. We also do not address the defendant's claim of error in the denial of her motion for a new trial. In that motion, the defendant argued that either prosecutorial misconduct or the ineffective assistance of counsel had permitted the admission of evidence of an operational second door in the bedroom in which the defendant and Petitry argued just before the stabbing. According to the defendant, and affidavits from a number of individuals in support of her motion for new trial, this alleged "second door" was sealed shut and, thus, did not present an avenue for the defendant's escape. The operability of any such second door, and its bearing on the legal issues raised in the case, are matters for the jury at any retrial.

certain prior bad acts, namely the details of two occasions on which she allegedly abused her son.

The facts at trial established that DSS had removed the defendant's children from their home on June 18, 2003, eight days before the stabbing.[13] Both children had been removed because of an allegation that the defendant had struck her son with a sandal across the face. The defendant "denied and has always denied" that this incident took place. A DSS investigator was planning to come to their home on what proved to be the day after the killing to discuss the matter.

The admissibility of the details of this incident was disputed throughout the trial, from before opening statements to the testimony of the final witness. We address, in turn, the admissibility of this prior bad act evidence at each point at which its admissibility was addressed by the trial judge, as well as that of a second instance of abuse that predated the defendant's relationship with Petitry and that took place at a shelter in 2002. In each instance, we review the ruling below for "palpable error." *Commonwealth* v. *McCowen*, 458 Mass. 461, 478 (2010), quoting *Commonwealth* v. *Fordham*, 417 Mass. 10, 23 (1994).

i. *Initial admissibility determination.* Before opening statements, the Commonwealth moved to admit the full details of the sandal incident forming the basis of the DSS complaint. The judge ruled that he was going to permit the admission in evidence only of the fact of the children's removal by DSS (i.e., not assign responsibility for their removal to either the defendant or Petitry). The judge considered the likelihood that both sides would be trying to portray the other as responsible, and acknowledged that "this type of evidence is prejudicial to both sides." However, after defense counsel, in his opening statement, suggested that Petitry "blamed [the defendant] for the loss of his daughter," the judge ruled that he would allow only the fact that the complaint was against the defendant to be admitted, but not its underlying details.[14]

The DSS case worker testified that her job was to "investigate

---

[13]Petitry was the father only of the infant daughter.

[14]According to the judge, these statements had opened the door because defense counsel had "made some statements about [Petitry] blaming [the defendant] for the DSS [involvement], and it made it sound like it was an unreasonable position."

families once [DSS] receives a report, a [G. L. c.] 51A report alleging that a kid has been physically abused or neglected." The prosecutor then elicited that such an investigation had related specifically to the defendant, asking:

*Q*: "And as part of your investigatory duties, did you have an occasion to become involved in an investigation relating to allegations against [the defendant]?"

*A*: "Yes."

The prosecution "may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purposes of showing [her] bad character or propensity to commit the crime charged." *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986), and cases cited. But, "if relevant for some other purpose," and if the probative value outweighs the risk of unfair prejudice, the judge may, in his discretion, admit evidence of a defendant's prior bad acts. *Commonwealth* v. *McCowen*, *supra* at 478. See Mass. G. Evid. §§ 403, 404(b) (2012). We have long recognized the rationale for this rule:

"Such evidence compels the defendant to meet charges of which the indictment gives him no information, confuses him in his defen[s]e, raises a variety of issues, and thus diverts the attention of the jury from the [crime] immediately before it; and, by showing the defendant to have been a knave on other occasions, creates a prejudice which may cause injustice to be done him."

*Commonwealth* v. *Jackson*, 132 Mass. 16, 20-21 (1882).

We generally restrict admission of prior bad act evidence to purposes such as "common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive." *Commonwealth* v. *Marshall*, 434 Mass. 358, 366 (2001), quoting *Commonwealth* v. *Helfant*, *supra* at 224. See *Commonwealth* v. *Butler*, 445 Mass. 568, 574 n.6 (2005) (collecting cases). Such evidence may also be admissible if it "rebut[s] the defendant's contentions" made in the course of trial. *Commonwealth* v. *Magraw*, 426 Mass. 589, 595 (1998).

The judge was correct in his initial ruling, made prior to

opening statements, that there was no independent basis for the admission of any details pertaining to the DSS complaint, including the sandal incident that precipitated it. To the extent that defense counsel, in his opening statement, thereafter suggested that Petitry had been responsible for the children's removal, the judge did not abuse his discretion in permitting limited evidence to rebut it, i.e., that the DSS complaint had been brought against the defendant.

While the fact that DSS had brought a complaint against the defendant may have had probative value, the details of that complaint nevertheless remained inadmissible as more prejudicial than probative. As to probative value, the details of the sandal incident were not relevant to any of the bases on which prior bad act evidence is considered admissible — "common scheme, pattern of operation, absence of accident or mistake, identity, intent or motive." *Commonwealth* v. *Marshall, supra* at 366, quoting *Commonwealth* v. *Helfant, supra.* The removal of the defendant's children by DSS was only relevant to shed light on the stress in the relationship between the defendant and Petitry, stress that may have triggered the argument leading to the stabbing. In this regard, once the jury heard that the DSS complaint was against the defendant, rather than Petitry, the details of that complaint would add no probative information and only heighten the risk of unfair prejudice to the defendant. See *State* v. *Allery,* 101 Wash. 2d 591, 598-599 (1984).[15] Even were this evidence in some way relevant to one of the specific purposes for which prior bad acts may be admitted, the history and details of the DSS complaint were considerably more prejudicial than probative. Contrast *Commonwealth* v. *McCowen, supra* at 478-480.

ii. *Admissibility as basis of expert testimony.* After the Commonwealth rested, the defendant called Burgess, who testified about the extensive history of abuse the defendant had suffered at many hands during her life, as detailed *supra.* At the outset, defense counsel requested a sidebar conference to discuss with

---

[15]We note that the sandal incident precipitating the DSS complaint did not involve any aggression against Petitry, which would have perhaps given it some probative value. See *Commonwealth* v. *Baker,* 440 Mass. 519, 531 (2003).

the judge how far he could go in examining Burgess without "opening the door" to the details of the DSS complaint.[16] Burgess then testified that Petitry had been "aggressive," "abusive," and "controlling," and described her diagnosis of PTSD.

On cross-examination and over objection, the judge allowed the prosecutor to elicit from Burgess the details of two occasions on which the defendant had allegedly struck her son. First, the prosecutor elicited the details of a 2002 incident, unrelated to the DSS complaint, and occurring before the defendant met Petitry, in which the defendant had been kicked out of a shelter for striking her son. As the basis for the admission of this evidence, the judge stated, during a sidebar conference, "[Burgess] relied on this. I'll allow it in." When asked about this instance of abuse, however, Burgess stated that she did not remember the incident but agreed with the prosecutor that it had appeared in the reports that had been provided to her.[17]

Later in his examination of Burgess, the prosecutor, over defense counsel's continuing objection, was also permitted to elicit the full details of the sandal incident precipitating the DSS complaint. Again, Burgess never testified that she had relied on the DSS complaint or its details in reaching her opinion as to the defendant's lack of criminal responsibility. In addition, the prosecutor suggested, by way of leading questions, that Petitry may have been concerned for the safety of his daughter because of the defendant's actions. Burgess indicated that she "didn't see any evidence on that."

The rationale for allowing the jury to hear the previously excluded prior bad act evidence was, in essence, that this information, about which Burgess had known, arguably formed the basis of her expert opinion and, as such, must be disclosed on

---

[16]DEFENSE COUNSEL: "I think I'm consistent with the Court's — what the Court has said when you had said that the fact that the children were taken away elevated the stress level, and also that [Petitry] may have wanted her to give up custody of her son intensified the stress. That's all she would be saying. And I think that's consistent with the Court's ruling that I can get into that without opening the door to the slapping. If that's correct, I'd like to."

THE JUDGE: "Okay."

DEFENSE COUNSEL: "Thank you."

[17]None of the reports relied on by any of the experts was admitted in evidence. See note 6, supra.

cross-examination. This rationale does not withstand scrutiny. As we discuss *infra*, the elicitation of information provided to an expert on cross-examination may be limited if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. Where, as here, the information known to the expert does not form the basis of the expert's opinion, does nothing to clarify or discredit the expert's opinion, and serves only to focus on the defendant's prior bad acts, the balance — after a weighing of prejudice against probative value — plainly favors exclusion of the evidence.

In forming their opinions, experts must rely on facts or data that are independently admissible.[18] See *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531-532 (1986) (*Department of Youth Servs.*). "If a party believes that an expert is basing an opinion on inadmissible facts or data, the party may request a voir dire to determine the basis of the expert opinion." *Id.* at 532. Here, the prosecutor did not request such a voir dire to challenge Burgess's testimony.[19] Instead, the prosecutor used cross-examination to elicit information provided to Burgess about the two alleged incidents.

"The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination." Mass. G. Evid. § 705 (2012). See *Department of Youth Servs., supra* at 532. Our rule allowing the admission of the bases of expert testimony on cross-examination,

[18]In determining whether the information relied on by the expert would be admissible, "[w]e note that the form in which information is ordinarily transmitted to an expert witness is often one that is not itself independently admissible. [However, i]t is not the form of the presentation to the expert that governs whether an opinion may be based thereon, but the nature of the facts or data contained in that presentation." *Commonwealth* v. *Markvart*, 437 Mass. 331, 337 n.4 (2002).

[19]The Commonwealth does not challenge the propriety of Burgess's opinion testimony. In connection with such testimony, Burgess had reviewed hospital and police reports that were a "permissible basis for an expert to consider in formulating an opinion," because "the underlying 'facts or data' contained [therein] would potentially [have been] admissible through appropriate witnesses." *Commonwealth* v. *Markvart, supra* at 337, quoting *Department of Youth Servs.* v. *A Juvenile*, 398 Mass. 516, 531 (1986).

however, "does not end the inquiry. In determining whether to allow an expert to testify to the facts underlying an opinion, the court must inquire whether . . . the testimony should be excluded because its probative value is substantially outweighed by the danger of unfair prejudice." *United States* v. *Gillis*, 773 F.2d 549, 554 (4th Cir. 1985) (interpreting analogous Federal rule). In other words, just because an expert is aware of, or was provided with, information does not mean that the information must automatically be disclosed to the jury. It remains within the judge's discretion to limit what information the expert can disclose during his or her testimony, see, e.g., *Commonwealth* v. *Waite*, 422 Mass. 792, 802-804 (1996), and to determine whether the expert can render his or her opinion on the basis of the evidence properly relied upon. See *Commonwealth* v. *Roman*, 414 Mass. 235, 237-239 (1993); *Commonwealth* v. *Pikul*, 400 Mass. 550, 555 (1987).

Once the Commonwealth sought to inquire over objection about this prior bad act evidence, it was incumbent on the judge in the sound exercise of his discretion to ascertain whether the evidence was probative and, if so, whether that probative value was substantially outweighed by the danger of unfair prejudice to the defendant.[20] "[E]vidence that poses a risk of unfair prejudice need not always be admitted simply because a defendant has opened the door to its admission; the judge still needs to weigh the probative value of the evidence and the risk of unfair prejudice, and determine whether the balance favors admission." *Commonwealth* v. *McCowen*, 458 Mass. 461, 479 n.15 (2010).

In assessing the probative value of the evidence, particularly given the judge's clear appreciation of the information's potential for unfair prejudice, the judge should first have determined whether and to what extent the expert had in fact relied on the incidents in question in forming her opinion, since "the fact that a witness has been exposed to [inadmissible evidence] does not imply that he has relied on it in the formation of his opinion." M.S. Brodin & M. Avery, Massachusetts Evidence § 7.5.3, at 433-434 (8th ed. 2007). Indeed, the record suggests that Burgess did not rely on these episodes in forming her expert opinion. To the contrary, she scarcely seemed to remember them. Contrast

---

[20]This inquiry should have occurred at sidebar or at a voir dire.

*Commonwealth* v. *Adams*, 434 Mass. 805, 821 (2001) (affirming admission of prior bad act evidence because it was "very significant" to expert's evaluation of defendant's mental state).

Moreover, this was not a situation "where the purpose of cross-examination [was] 'to shake the foundation of the defense experts' opinions rather than to focus on the defendant's prior [bad conduct].' " *Commonwealth* v. *Colleran*, 452 Mass. 417, 425-426 (2008), quoting *Commonwealth* v. *Killelea*, 370 Mass. 638, 650 (1976).[21] Instead, there appears to have been no purpose for eliciting this testimony other than to prejudice the defendant. Nothing in the details of these incidents undermined Burgess's diagnosis of PTSD or her opinion that the defendant, as a result thereof, lacked criminal responsibility. *Commonwealth* v. *Trapp*, 396 Mass. 202, 207 (1985), *S.C.*, 423 Mass. 356, cert. denied, 519 U.S. 1045 (1996). At no point during cross-examination did the prosecutor try to use Burgess's knowledge of these incidents to refute her opinion, or even ask whether these incidents affected her diagnosis.[22] "An expert's testimony explaining the foundation for [her] opinion should not, of course, serve as a channel for the introduction of unnecessary and prejudicial evidence." *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982), citing *Hunt* v. *Boston*, 152 Mass. 168, 171 (1890). The prosecutor simply extracted the details of the incidents from Burgess by use of leading questions, making no effort to use this information to discredit her opinion in the eyes of the jury.[23]

---

[21]In both *Commonwealth* v. *Colleran*, 452 Mass. 417, 425-426 (2008), and *Commonwealth* v. *Killelea*, 370 Mass. 638, 650 (1976), we affirmed the admission of prior bad evidence on cross-examination of a defendant's expert because those prior bad acts demonstrated that the defendant had not been entirely truthful during interviews with the expert. The defendant's untruthfulness in those cases undermined the reliability of those experts' opinions. Here, however, the prior bad act evidence was in no way probative of the defendant's truthfulness, and thus did not undermine Burgess's opinion. Burgess was aware of both incidents, and the Commonwealth never suggested that the defendant had withheld information or been untruthful in discussing these prior incidents with Burgess.

[22]Note that the opposing party may also undermine the expert's opinion by pointing out the expert's *failure* to rely on information that would seemingly be relevant to the expert's assessment.

[23]If anything, the allegation that the defendant had struck her son on two occasions would appear to strengthen the basis for Burgess's diagnosis, as she testified that individuals with PTSD are prone to "angry outbursts."

The details of the defendant's prior bad acts were not rendered admissible by Burgess's testimony, and it was error for those details to be admitted during her cross-examination.

iii. *Admissibility through other witnesses.* Two subsequent witnesses were then permitted to testify, over objection, as to the details of the DSS complaint. During cross-examination of Lawton, the prosecutor asked whether the defendant "was alleged to have hit her five year old son in the face with a sandal." Lawton, the defendant's lawyer in the contested DSS matter, answered in the affirmative. The prosecutor thereafter recalled the DSS case worker, who described — again, over objection — in significant, protracted detail the reason that the children were taken away from their home.[24] In particular, the DSS caseworker testified about the facial injury to the defendant's son ("visible bruises on the left side of his face" that looked like "the sole of a shoe"), the entire process of the DSS investigation, the taking of the child to the hospital, the removal of the child from his home, and his placement in foster care.[25]

Nothing in the record indicates why the prosecutor was allowed to introduce the prior bad act evidence again and in such detail. To the extent that the admission of such evidence was permitted in cross-examining Burgess to explore the basis of her expert opinion, that rationale, albeit flawed, has no application to Lawton or the DSS case worker. Having thus acquired no new probative value, the lengthy — and considerably more detailed — recitation of the incident from the DSS case worker only increased the prejudicial effect of this information. These details remained inadmissible through the testimony of these subsequent witnesses.[26]

For the foregoing reasons, the repeated admission in evidence

---

[24]The judge gave an additional limiting instruction at this point, telling the jury that this information was to put the information regarding DSS "into context" and could not be considered to show the defendant's "propensity to commit the act which she's charged with."

[25]During closing argument, the prosecutor returned to this theme:

> "They were living together . . . . She had a five year old son, together they had a four week old daughter who were then in the custody of the Department of Social Services because of her, because of her conduct."

[26]For the first time on appeal, the Commonwealth argues that these details

of the details of the defendant's prior bad acts in allegedly striking her son on two occasions was palpable error.

iv. *Prejudice.* Given that the defendant objected in each instance to the erroneous admission of the prior bad acts, we must determine, "after pondering all that happened without stripping the erroneous action from the whole, [whether] the judgment was not substantially swayed by the error." *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163, cert. denied, 525 U.S. 1007 (1998), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

"It is implicit in the general rule regarding the inadmissibility of prior bad acts evidence that the admission of such evidence carries with it a high risk of prejudice to the defendant." *Commonwealth* v. *Barrett*, 418 Mass. 788, 795 (1994). See *Commonwealth* v. *Adjutant*, 443 Mass. 649, 660 n.14 (2005). The likelihood of prejudice from the repeated admission of detailed evidence of two previous occasions when the defendant allegedly struck her young son was quite considerable in these circumstances. The nature of this prior bad act evidence, relating as it did to the alleged physical abuse of a young child by his mother, made it particularly likely to prejudice the jury against the defendant, the child's mother, on trial for murdering her live-in boy friend. See *Valmonte* v. *Bane*, 18 F.3d 992, 1004 (2d Cir. 1994), quoting *Santosky* v. *Kramer*, 455 U.S. 745, 762 (1982) (such evidence is "inherently inflammatory, and 'unusually open to the subjective values of' the fact[]finder").

Furthermore, the details of this incident were repeatedly

---

were relevant to rebut the defendant's presentation of herself as "nothing but a long suffering victim." This is not a proper basis on which to admit the details of these incidents. "Evidence of prior bad acts is not admissible to show that the defendant . . . is of bad character." *Commonwealth* v. *Otsuki*, 411 Mass. 218, 236 (1991), quoting *Commonwealth* v. *Robertson*, 408 Mass. 747, 750 (1990). Although we generally permit the Commonwealth properly to rebut a defendant's factual contentions with such evidence, *Commonwealth* v. *Magraw*, 426 Mass. 589, 595 (1998), the defendant made no assertions during the trial that opened the door to this information. Uncontroverted evidence of the abuse suffered by the defendant was admitted to explain the basis for the multiple expert diagnoses of PTSD and the experts' conclusions that the defendant was not criminally responsible for her actions. It did not serve to establish any character trait of the defendant as a "victim" that the Commonwealth could then rebut with instances when she acted as an aggressor. The Commonwealth's argument to the contrary is without merit.

introduced, through three separate witnesses, in significant detail. See *Commonwealth* v. *Mahdi*, 388 Mass. 679, 696-697 (1983) ("frequency of the reference" is factor in prejudicial error analysis). Allegations that the defendant slapped her son with a sandal so hard that he had to be taken to the hospital, and that she had struck him on a previous occasion, were very likely to prejudice the jury against the defendant because it was relevant to no other purpose than to show that the "defendant has a propensity for criminal conduct," here, a tendency to violence. *Commonwealth* v. *Moure*, 428 Mass. 313, 319 (1998). The DSS case worker, in particular, described the incident in considerable detail, cementing the prejudicial information in the minds of the jury. During Burgess's testimony, no limiting instruction was provided to the jury narrowing their consideration of these facts only to an assessment of her opinion. The jury were allowed to consider the testimony for its truth, notwithstanding that it was improper character evidence. Contrast *Commonwealth* v. *Jaime*, 433 Mass. 575, 578 (2001).[27]

Finally, no other properly admitted evidence served to establish any details of violent episodes on the part of the defendant, such that admission of this evidence might be considered at least somewhat cumulative. Contrast *Commonwealth* v. *Sharpe*, 454 Mass. 135, 144 (2009). Moreover, the DSS case worker, who provided a lengthy recitation of the details of the alleged incident involving a sandal, was the final witness, which ensured that these details were "fresh in the jury's mind when they began deliberations." *Commonwealth* v. *Chambers*, 81 Mass. App. Ct. 624, 629 (2012), citing *Yeboah Sefah* v. *Ficco*, 556 F.3d 53, 78 (1st Cir.), cert. denied, 130 S. Ct. 639 (2009).

We need not decide, however, whether the erroneous seriatim admission of prior bad act evidence, standing alone, requires a new trial. As we discuss in part 2.b, *infra*, it was also error not to have instructed the jury as to the excessive use of force in

[27]The judge gave a limiting instruction during the testimony of the DSS case worker that "because there's been much testimony regarding what took place regarding DSS," the evidence as to the incident involving the sandal could only be considered as "context." But the details of the complaint added little, if anything, to the context that the jury properly could consider; the only purpose this evidence could have possibly served was to prejudice the jury against the defendant.

self-defense, which mitigates murder to manslaughter. This alone requires a new trial. See *Commonwealth* v. *Richards*, 384 Mass. 396, 405 (1981). Certainly, when considered together, we cannot say that these errors had only a "very slight effect" on the jury. *Commonwealth* v. *Flebotte, supra,* quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). Thus, a new trial is required.

b. *Instruction on excessive use of force in self-defense.* The defendant argues that the evidence entitled her to an instruction on excessive use of force in self-defense,[28] which may mitigate a killing from murder to manslaughter. *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 733 n.15 (2007). At trial, the judge, after initially allowing the defendant's request to give an instruction on excessive use of force in self-defense, ultimately declined to provide such an instruction because it "requires a reasonable apprehension," and the case "wasn't tried that way."

"Before a judge is required to give a requested instruction, there must be some basis in evidence, viewed in the light most favorable to the proponent, supporting the requested instruction." *Commonwealth* v. *Cook*, 419 Mass. 192, 201 (1994). To receive an instruction on the excessive use of force in self-defense, "the defendant must be entitled to act in self-defense," *Commonwealth* v. *Berry*, 431 Mass. 326, 335 (2000), but "used more force than was reasonably necessary in all the circumstances of the case." *Commonwealth* v. *Glacken*, 451 Mass. 163, 167 (2008). For a defendant to be entitled to use deadly force, as the defendant did here,[29] she must have "a reasonable apprehension of great bodily harm and a reasonable belief that no other means would suffice to prevent such harm." *Commonwealth* v. *Houston*, 332 Mass. 687, 690 (1955). See *Commonwealth* v. *Walker*, 443

---

[28]The defendant does not argue that she was entitled to an instruction on self-defense as a complete defense. We therefore do not consider this argument.

[29]Although the fact that death results does not necessarily require a conclusion that a defendant used deadly force, see *Commonwealth* v. *Pike*, 428 Mass. 393, 396 n.3 (1998) ("relevant inquiry is what level of force was used, not what the resulting injuries were"), here, we conclude that the use of a sharp sixteen-inch piece of glass constitutes deadly force as a matter of law. See *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 733 (2007), citing *Commonwealth* v. *Toon*, 55 Mass. App. Ct. 642, 644 n.3 (2002) (knife constitutes deadly weapon).

Mass. 213, 215-219 (2005) ("If deadly force were used, then the deadly force standard should be applied").

The defendant maintains that, although perhaps not reasonable if experienced by an individual without her history of abuse, the lifelong abuse the defendant has suffered could render reasonable her apprehension of great bodily harm and her belief that no other means would suffice to prevent it, thereby making appropriate an instruction on the excessive use of force in self-defense. The Commonwealth argues in response that the evidence was insufficient to establish the objective reasonableness of the defendant's fear and, thus, that the instruction was not warranted.[30]

The propriety of such an instruction turns on the application of G. L. c. 233, § 23F (§ 23F).[31] As relevant here, § 23F not

---

[30]The Commonwealth contends also that the defendant's theories of self-defense, reasonable provocation, and lack of criminal responsibility are inconsistent. We disagree. The expert testimony is consistent with all three theories, i.e., the defendant's reaction arose from Petitry's alleged violence and her fear in response. An attack by a victim can give rise to a need for self-defense, see *Commonwealth* v. *Rodriquez*, 418 Mass. 1, 5 (1994), and a heat of passion resulting from reasonable provocation, see *Commonwealth* v. *Acevedo*, 446 Mass. 435, 444 (2006), and can trigger a defendant's mental illness such that she lacks the substantial capacity at that time both to appreciate the wrongfulness of her conduct and to conform her conduct to the requirements of the law. See *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). We see no inconsistency in allowing instructions on all three theories, particularly because we allow a defendant's fear to form the basis of reasonable provocation. See *Commonwealth* v. *Glover*, 459 Mass. 836, 841 (2011), quoting *Commonwealth* v. *Acevedo*, *supra* at 443 ("Reasonable provocation is provocation that 'would have been likely to produce in an ordinary person such a state of passion, anger, *fear*, fright, or nervous excitement as would eclipse his capacity for reflection or restraint' " [emphasis added]). See also *Commonwealth* v. *Lapage*, 435 Mass. 480, 486 n.7 (2001) ("In a case like this, the defendant is entitled to correct instructions on both provocation and self-defense, and the jury are to have an opportunity to consider voluntary manslaughter on both theories"); Dressler, Rethinking Heat of Passion: A Defense in Search of a Rationale, 73 J. Crim. L. & Criminology 421, 448-449 (1982) (describing consistency of heat of passion, voluntary manslaughter, and self-defense in such cases).

[31]General Laws c. 233, § 23F, provides, in relevant part:

"In the trial of criminal cases charging the use of force against another where the issue of defense of self or another, defense of duress or coercion, or accidental harm is asserted, a defendant shall be permitted to introduce either or both of the following in establishing the

only allows the introduction of evidence of a defendant's past instances of abuse, including, but not limited to, those involving the victim, but also permits the use of such evidence to establish "the reasonableness of the defendant's apprehension that death or serious bodily injury was imminent."[32] As § 23F makes clear, the psychological consequences of a history of abuse are relevant to the consideration whether the defendant was in fear of serious injury or death.[33] See *Commonwealth* v. *Pike*, 431 Mass. 212, 222-223 (2000).

Consideration of this evidence does not, however, provide a "blanket justification for [the defendant] to use force in resolving disputes." *Commonwealth* v. *Haddock*, 46 Mass. App. Ct. 246, 249 n.4 (1999). Instead, using the defendant's past history of abuse as "one of many factors . . . in determining the reasonableness of the defendant's conduct," *id.*, we engage in a careful assessment of the circumstances of the stabbing, the defendant's history of abuse, and the expert testimony in deciding

reasonableness of the defendant's apprehension that death or serious bodily injury was imminent, the reasonableness of the defendant's belief that he had availed himself of all available means to avoid physical combat or the reasonableness of a defendant's perception of the amount of force necessary to deal with the perceived threat:

"(*a*) evidence that the defendant is or has been the victim of acts of physical, sexual or psychological harm or abuse;

"(*b*) evidence by expert testimony regarding the common pattern in abusive relationships; the nature and effects of physical, sexual or psychological abuse and typical responses thereto, including how those effects relate to the perception of the imminent nature of the threat of death or serious bodily harm; the relevant facts and circumstances which form the basis for such opinion; and evidence whether the defendant displayed characteristics common to victims of abuse."

[32]This is consistent with other evidentiary rules that have long allowed the admission of certain information known to the defendant for the purposes of a claim of self-defense. See *Commonwealth* v. *Fontes*, 396 Mass. 733, 735-736 (1986) (instances of victim's prior acts of violence admissible); *Commonwealth* v. *Edmonds*, 365 Mass. 496, 502 (1974) (victim's violent reputation admissible).

[33]The evidence admitted in this case related to what is typically referred to as "battered woman syndrome." "Battered woman syndrome has been described as a 'series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives.' " *Commonwealth* v. *Pike*, 431 Mass. 212, 221 (2000), quoting *State* v. *Kelly*, 97 N.J. 178, 193 (1984).

whether — viewing the evidence in the light most favorable to the defendant (the proponent of the instruction), *Commonwealth v. Cook, supra* at 201 — the circumstances were sufficient to warrant the instruction sought.[34]

According to the testimony of the only percipient witness, Fouyolle, the defendant walked out of the bedroom, in which she and Petitry had been arguing, and stabbed Petitry in the chest with a shard of glass.[35] The witness testified that, during the argument preceding the stabbing, he looked into the bedroom once and saw Petitry positioned on top of the defendant. There was also evidence that Petitry may have held the door closed momentarily after leaving the room, and may have been moving toward the defendant just before the stabbing as she stepped out of the bedroom. In her statements to the police, the defendant said that Petitry, who was a "big, strong, [and] muscular" man, had "hit her and she was afraid."

According to the defendant's experts, the defendant, who had multiple diagnoses of PTSD and depression, was unmedicated at the time of the stabbing. These experts testified that "that glass was likely to be as much for defense, because . . . she was terrified." Petitry — who had been "aggressive," "abusive," and "controlling" in the relationship — had an elevated blood alcohol content; the defendant had stated that "he became even more abusive and aggressive" when under the influence of alcohol. On one occasion, three days before the stabbing, the defendant expressed a fear that, if she sought a restraining order against Petitry, he would kill her.

The defendant's experts also described how the defendant's history of abuse could affect her assessment of the situation. According to Burgess, that Petitry had forced himself on top of

---

[34]We are mindful that "the event to which a battered woman responds may seem imminently life-threatening only in the context of past abuse," Taylor, Provoked Reason in Men and Women: Heat-of-Passion Manslaughter and Imperfect Self-Defense, 33 UCLA L. Rev. 1679, 1704 (1986), and that "because of her intimate knowledge of her batterer, the battered woman perceives danger faster and more accurately as she is more acutely aware that a new or escalated violent episode is about to occur." *Bechtel* v. *State*, 840 P.2d 1, 10 (Okla. Crim. App. 1992).

[35]The witness acknowledged previous testimony during cross-examination, in which he had stated that the defendant had made the statement, "I'm going to kill you," only while she and Petitry were both still in the bedroom.

the defendant "certainly had enough intensity to trigger the incident that she had with [her previous boy friend who had tried to suffocate her while biting a mole off her cheek]." Keane also viewed this as "a key trigger back to a prior experience that she was again being assaulted by someone on top of her." Burgess testified that it did not matter whether the earlier abuse was at the hands of Petitry or another individual, because "it still is going after the fear response because it activates the memories, the traumatic memories, because it's a similar kind of situation." Even though Petitry had left the room, the defendant remained "frightened" and, by remaining in the room, was "captive, if you will, to further injury in her mind."

Viewing this evidence in the light most favorable to the defendant, a jury instruction on the excessive use of force in self-defense was required.[36] The defendant's statements to the police and to the experts were sufficient to establish, for purposes of the requested instruction, that she was actually in fear of serious bodily injury, if not also in a dissociative state, at the time of the stabbing. Although the percipient witness testified that Petitry had left the room, expert testimony established that the argument in the bedroom, including Petitry's positioning of himself on top of the defendant, had acted as a "trigger" in the defendant's mind, from which she suffered continuing injury even in the "[n]ot even ten seconds" after he had left the room. Contrast *State* v. *Hendrickson*, 81 Wash. App. 397, 398-399 (1996). Assessing the reasonableness of the defendant's fear in light of her history of abuse, as called for by § 23F, we cannot say, viewing the evidence in the light most favorable to the defendant, that this matter should have been removed from the province of the jury.

Declining to give this instruction prejudiced the defendant. "The evidence warranted a finding of excessive force in self-defense, and if the jury so found, the defendant was entitled to a verdict of manslaughter. There can be no doubt of a miscar-

---

[36]Because the defendant has not disputed whether the language of our model jury instructions on the excessive use of force in self-defense, see Model Jury Instructions on Homicide 31-33 (1999), sufficiently conveys the jury's ability to consider her past history of abuse in assessing the reasonableness of her fear of serious injury or death, as called for by G. L. c. 233, § 23F, we do not address that point.

riage of justice if a defendant guilty of manslaughter is serving the penalty for murder." *Commonwealth* v. *Santos*, 454 Mass. 770, 776 (2009) (concluding that same error, by itself, requires reversal of conviction of murder in first degree).

3. *Conclusion.* The defendant's conviction of murder in the first degree is reversed, the verdict is set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*