## COMMONWEALTH vs. RAMON MARTINEZ.

No. 98-P-1626.

Hampden. January 26, 2000. - December 4, 2001.

Present: ARMSTRONG, C.J., SMITH, & BROWN, JJ.

*Homicide. Assault and Battery by Means of a Dangerous Weapon. Evidence,*
Cross-examination. *Witness,* Cross-examination. *Practice, Criminal,* Cross-
examination by prosecutor, Argument by prosecutor.

At a criminal trial, even assuming that the judge erred in allowing the prosecu-
tion to cross-examine the defendant and three defense witnesses regarding
their failure to report an incident involving the victim to the police prior to
trial, the error resulted in no prejudice that would warrant a new trial,
where there was a "fair assurance" that the challenged evidence did not
have a significant impact on the jury's verdict. [330-331]

At a criminal trial, the prosecutor, in the context of her entire closing argu-
ment, did not misstate the defendant's testimony, but permissibly argued a
reasonable inference from the evidence. [331-332]

INDICTMENTS found and returned in the Superior Court Depart-
ment on June 24, 1997.

The cases were tried before *Daniel A. Ford,* J.

*Peter M. Onek,* Committee for Public Counsel Services, for
the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the
Commonwealth.

SMITH, J. The defendant has appealed from his convictions of
voluntary manslaughter (on an indictment which charged him
with murder in the first degree), assault and battery by means of
a dangerous weapon, unlawful possession of a firearm, and
unlawful discharge of a firearm within 500 feet of a dwelling.

On appeal, the defendant argues that the trial judge commit-
ted error in allowing the prosecutor to question him and three
defense witnesses about their failures to inform the police about
a prior encounter the defendant had had with the victim, in

which the victim had held a gun to the defendant's head and had threatened him. The defendant also claims that the prosecutor created reversible error when she misstated the defendant's testimony in her closing argument.

*The Commonwealth's case.* The Commonwealth introduced the following evidence at trial. In the early morning hours of June 1, 1997, the defendant and his girlfriend, Maria Ramos, were awakened in their second-floor apartment in Holyoke by the sound of fighting on the street. When they looked out the window, they observed a large throng of people that had spilled onto the street from a party in the neighborhood. Because of the noise, police officers were called to the scene, but they then departed. The defendant told Ramos that "there was a guy downstairs that he had a problem with before" and that he was going downstairs to the street. Ramos told him not to go. When the defendant left, he looked "a little nervous, scared, and a little hyper," according to Ramos.

The victim, Miguel Hernandez, was sitting in a van, which was parked in the street, with three friends, Carlos Navarro, Alberto Fernandez, and Giovanni Martinez. The victim and his three friends were members of the Latin Kings gang. The defendant, who was a member of the La Familia gang, approached the van, pulled out a gun, and fired at the victim. No one in the van had a gun and the victim was not reaching for anything just before he was shot. The victim was shot four times and died from his wounds. Navarro also sustained a gunshot wound. The defendant fled the scene and was arrested the next day.

*The defendant's case.* The defendant claimed that he shot the victim in self-defense. In support of his claim, the defendant testified that on April 11, 1997 (about seven weeks prior to the shooting), the victim had threatened to kill him. Earlier on that day, the defendant had had a physical altercation with one Benny Escobar, a friend of the victim. The defendant encountered Escobar again later the same day. Escobar was in the company of the victim and the victim's brother, Ramon Hernandez. The defendant saw Ramon remove a sawed-off rifle from the sleeve of his jacket. After pointing the gun in the defendant's direction, Ramon handed the gun to the victim, who cocked it and

held it to the defendant's head. A police cruiser arrived at the scene and Escobar, the victim, and Ramon fled.[1]

The defendant testified that on June 1 (the day of the shooting), he and his girlfriend were awakened by what appeared to be a fight in the street below. The defendant did not see the victim or the van on the street when he looked out his window. He did observe two or three of his friends and, because he was concerned that a fight might involve them or members of his girlfriend's family, he decided to get dressed and go downstairs. He took his gun with him "for . . . protection."

As the defendant stood in front of his apartment building, he heard someone call out his nickname. Looking across the street, he observed a van, but could not tell who was inside because the van's windows were tinted and its doors were shut. Assuming that the voice was that of a friend, the defendant approached the van and saw the driver's window roll down and the door open slightly. The defendant soon realized that the victim was sitting in the driver's seat. Recalling the April 11 incident, the defendant became frightened and jumped back. As he did so, the door of the van opened completely, enabling the defendant to see the victim reach for a black-handled object at his hip resembling a revolver. Believing that his life was in danger, the defendant reacted by pulling out his gun and shooting the victim four or five times.

The defendant fled, and as he ran, he heard six or seven shots, which he believed were directed at him. He dropped his gun and ran to an acquaintance's apartment and made a telephone call, after which two friends picked him up. He was ultimately arrested at the apartment of a friend.

Three defense witnesses, Miguel Vasquez, Carlos Marrero, and Balthazar Marrero, all testified that on April 11, they had observed the victim threaten to kill the defendant with a gun.

Over objection, the judge allowed the prosecutor to cross-examine the defendant and his three witnesses as to whether

---

[1] A police officer was called as a witness by the defendant and testified that on April 11, 1997, he saw the victim's brother holding a rifle in a large group of youths. When the officer approached, the victim's brother ran but was caught and arrested. The officer knew the victim but did not see him in the group.

they had told the police about the April 11 encounter between the defendant and the victim. The defendant and the three witnesses admitted that they had not told the police about the April 11 incident before they testified at trial. In her summation to the jury, the prosecutor commented on the failure of the defendant and his witnesses to notify the police of the April 11 encounter.

The judge instructed the jury that on the murder indictment, they could return one of four possible verdicts, viz., guilty of murder in the first degree, guilty of murder in the second degree, guilty of voluntary manslaughter, or not guilty.

*The cross-examination issue.* The defendant claims that it was error for the prosecutor to cross-examine him regarding his failure to report the April 11 incident to the police. The defendant argues that the line of questioning constituted improper impeachment with his prearrest silence, citing *Commonwealth* v. *Nickerson*, 386 Mass. 54, 57-63 (1982).[2] He also contends that the cross-examination of his three defense witnesses, regarding their failure to report the April 11 incident to the police prior to the trial, was improper because the prosecutor failed to establish the proper foundation as required by *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 295-297 (1981).[3] The defendant argues that because he objected to the cross-examination, we must review the judge's rulings for prejudicial error.[4] See *Commonwealth* v. *Flebotte*, 417 Mass.

---

[2] In *Commonwealth* v. *Nickerson*, 386 Mass. 54, 62-63 (1982), the court stated that in the circumstances of that case, it was reversible error for the judge to instruct the jury that, in determining the credibility of the defendant's testimony, they might consider that he did not come forward prior to his arrest with his exculpatory version of the events at issue.

[3] In *Commonwealth* v. *Brown*, 11 Mass. App. Ct. 288, 295-297 (1981), the court held that in order to impeach a witness for failure to report exculpatory information to the authorities, the prosecutor should lay a foundation by first establishing that the witness knew of the pending charges in sufficient detail to realize that they possessed exculpatory information, that the witness had a reason to make the information available, that the witness was familiar with the means of reporting it to proper authorities, and that the defendant or the defendant's lawyer, or both, did not ask the witness to refrain from doing so.

[4] The Commonwealth argues that the defendant did not properly object to the cross-examination of the defendant and his witnesses concerning their failure to report the victim's threats at the April 11 encounter. We think the

348, 353 (1994). Even if we assume the judge's rulings were in error, we find no prejudice that would warrant a new trial.

The jury returned a verdict of voluntary manslaughter, not first or second degree murder. The judge had instructed the jury on alternative theories by which the murder charge could be reduced to voluntary manslaughter: (1) the use of excessive force in self-defense; and (2) heat of passion induced by reasonable provocation or sudden combat. The defendant argues his defense was prejudiced because "it may well be that the improper impeachment impelled the jury to reject outright [the defendant's] claim of self-defense [under which acquittal was a possibility] and to focus instead on the heat-of-combat theory of manslaughter," which could not yield an acquittal. We conclude there is "fair assurance" that the challenged evidence did not have a significant impact on the jury's verdict. See *Commonwealth* v. *Ford*, 397 Mass. 298, 302 (1986). First, the defendant fails to explain how the jury's disbelief in his version of the April 11 incident would have altered the relative likelihood of their use of either theory when that evidence appears equally probative of both. Second, even if the jury had focused on self-defense as the defense desired, the evidence of excessive force was very powerful: the victim was shot four times, and the medical examiner testified without contradiction that three of the four gunshots were sustained as the victim was turning away from the gunfire. The evidence weakened by the impeachment would not have made the use of such force significantly more reasonable.

*The prosecutor's closing argument.* The defendant claims that the prosecutor misstated his testimony in her closing argument because she argued that the defendant had testified that on June 1 he had seen the victim from the bedroom window before he went downstairs to the street.

Remarks made during closing argument are viewed in the context of the entire argument, and in light of the judge's

---

defendant's objection to the Commonwealth's cross-examination was sufficient to put the judge on notice of the principles involved in both *Commonwealth* v. *Nickerson, supra,* and *Commonwealth* v. *Brown, supra.* In any event, even if the defendant did not properly object, and we assume error, the judge's rulings did not create a substantial risk of a miscarriage of justice.

instructions to the jury and the evidence at trial. *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 746 (1990). Further, "[p]rosecutors are entitled to marshal the evidence and suggest inferences that the jury may draw from it." *Commonwealth* v. *Dinkins*, 415 Mass. 715, 725 (1993), quoting from *Commonwealth* v. *Drayton*, 386 Mass. 39, 52 (1982).

In the context of the prosecutor's entire argument, we hold that she did not misstate the evidence, but permissibly argued that it was a reasonable inference from the evidence that the defendant, contrary to his testimony, did indeed see the victim before he went downstairs with his gun.

*Judgments affirmed.*