NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-13223

COMMONWEALTH  vs.  ANILDO LOPES CORREIA.


Plymouth.      October 7, 2022. - June 12, 2023.

Present (Sitting at Plymouth):  Budd, C.J., Gaziano, Lowy,
        Cypher, Kafker, Wendlandt, & Georges, JJ.


Homicide.  Evidence, Disclosure of evidence, Relevancy and
    materiality, Prior misconduct, Inflammatory evidence, Self-
    defense.  Self-Defense.  Jury and Jurors.  Practice,
    Criminal, Discovery, Disclosure of evidence, Cross-
    examination by prosecutor, Jury and jurors, Instructions to
    jury.


    Indictment found and returned in the Superior Court
Department on June 16, 2015.

    The case was tried before Brian A. Davis, J.

    The Supreme Judicial Court granted an application for
direct appellate review.


    Eva G. Jellison (Melissa Ramos also present) for the
defendant.
    Johanna S. Black, Assistant District Attorney, for the
Commonwealth.
    Rebecca Kiley, Committee for Public Counsel Services, Leon
Smith, Joshua M. Daniels, & Katharine Naples-Mitchell, for
Citizens for Juvenile Justice & others, amici curiae, submitted
a brief.

BUDD, C.J.  The defendant, Anildo Lopes Correia, was charged with murder in the first degree in connection with the stabbing death of Ywron Martins.  After a jury trial, the defendant was convicted of the lesser charge of voluntary manslaughter, and was sentenced to from ten to twelve years in State prison on June 17, 2019.  We granted the defendant's application for direct appellate review, and for the reasons discussed infra, we affirm.[1]

Background.  We recite the facts the jury could have found at trial, reserving certain details for later discussion.  On the late afternoon of April 22, 2015, in a Brockton park multiple fights broke out amongst a large group of individuals between fourteen and twenty years of age.  The defendant, who went to the park to look for his cousin, began fist fighting with the victim soon after he arrived.  Although there was conflicting testimony regarding how the fight began, at some point the defendant gained the upper hand, landing a punch that caused the victim to stumble backward.  The defendant then lifted the victim's shirt, pulled out a knife, and began thrusting it into the victim's body.  The defendant continued to

---

[1] We acknowledge the amicus brief submitted by Citizens for Juvenile Justice, Committee for Public Counsel Services, Massachusetts Association of Criminal Defense Lawyers, New England Innocence Project, Charis E. Kubrin, and Jack Lerner.

attack the victim with the knife after police had arrived, announced their presence, and engaged their sirens.

At trial, the defendant testified that the victim and he once were friendly and remained "friends" on social media platforms until the day of the fight. The defendant admitted that he stabbed the victim but that he did so believing that the victim was reaching for a gun.

The defendant further testified that after he punched the victim, causing him to stumble back, the defendant laughed and asked the victim if "that's all he ha[d], that's all he got." The victim then looked at the defendant and said, "[N---a], do you know how the hot shit feel?" The defendant understood the question to be a lyric from a rap song known to him at the time, meaning "[do] you know how to burn from the bullets?" According to the defendant, the victim then took off his backpack and reached inside. The combination of the victim's words and reaching into his backpack caused the defendant to believe that the victim was about to pull out a gun to shoot him. Fearing this, the defendant testified that he lunged at and stabbed the victim with a pocketknife. He continued to do so in an attempt to get the victim to drop the bag. When the defendant heard police announce themselves, he began to run, but as he did so, the victim grabbed his shirt, so he continued punching the victim "trying to get out of there." The defendant eventually

ran from the park, in the process dropping the jacket that contained the knife he had used in the fight.

The victim was not breathing and had no pulse when emergency personnel arrived. He was pronounced dead at a hospital. An autopsy revealed that the victim had twelve wounds created by a sharp instrument, two of which were fatal: one that penetrated the victim's heart, and another that struck the victim's liver. Police located the defendant four days later in Fall River.

Discussion. On appeal, the defendant argues that a number of errors entitle him to a new trial: (1) rap lyrics written by the defendant erroneously were admitted both because the Commonwealth violated its discovery obligations and because they were unduly prejudicial; (2) the Commonwealth improperly commented on the defendant's prearrest silence, suggesting that it indicated his culpability; (3) one of the deliberating jurors was not fair and impartial; and (4) the instructions provided to the jury misstated the law on self-defense. The defendant also argues that the cumulative effect of the errors requires reversal.

1. Defendant's rap lyrics. As part of his self-defense strategy, the defendant testified about and offered in evidence posts he had seen on the victim's Facebook social media account. The posts included images of the victim seated with a pistol,

the victim covering his face with a rifle behind him, the victim seated in a car with a knife in his hand, and the victim seated in front of a motorcycle with a pistol across his lap. The defendant testified that he saw this last photograph on the day of the fight, along with another image of the victim posted with the caption: "Don't Let a Sneak Dissin to a Murder," which the defendant said he understood to mean, "Don't get killed over talking behind somebody's back." The defendant testified that the posts, together with the victim's statement during the fight, prompted his belief that the victim possessed, and was prepared to use, a gun.

During cross-examination, the Commonwealth asked the defendant about his own social media posts, including four rap songs the defendant wrote and posted to his "channel" on the video sharing Web site YouTube. The Commonwealth questioned the defendant on select lyrics from these songs that included "[l]iving this [l]ife of [c]rime," "being at war with the north," "[e]nemies [t]urn[ing] to [m]emories," and "I love my Glock, pop, now you're dead." The Commonwealth also asked about another song, the cover image of which depicted an unidentified person in a T-shirt with an AK-47. Trial counsel objected to the prosecution's references to the defendant's lyrics and cover image as prior bad acts of which the Commonwealth had not given notice. That objection was overruled. The following day

counsel moved for a mistrial, arguing that the defendant never received notice of the Commonwealth's intention to use them and that, had notice been given, counsel would have made different decisions, including advising the defendant not to testify.[2]  The motion was denied.

a.  Rule 14 (a) of the Massachusetts Rules of Criminal Procedure.  The Commonwealth is required to "disclose to the defense . . . [a]ny written or recorded statements, and the substance of any oral statements, made by the defendant" "provided [they are] relevant to the case and [are] in the possession, custody or control of the prosecutor."  Mass. R. Crim. P. 14 (a) (1) (A) (i), as amended, 444 Mass. 1501 (2005).  The Commonwealth contends that, because the defendant's rap lyrics were publicly available online, the prosecution never possessed, controlled, or had custody of them within the meaning of Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004) (rule 14).  We take a broader view of what it means for

---

[2] According to the Commonwealth, it discharged its discovery obligations when it turned over a police report, which stated that a witness told police "she knows [the defendant] to have rap music on YouTube under the name AC$TACK$."  This argument hinges on the Commonwealth's assertion that because it did not have possession, custody, or control of the defendant's lyrics, it only was required to "notify the defendant of the existence" of his lyrics.  Mass. R. Crim. P. 14 (a) (1) (E), as appearing in 442 Mass. 1518 (2004).

something to be "in the possession, custody or control of the prosecutor" than does the Commonwealth.

The operative terms at issue, "possession," "custody," and "control," are not defined in rule 14.  Moreover, their ordinary meanings may be broad or narrow depending on the context of their use.  For example, "possession" may be "actual" or "constructive," "exclusive" or "joint."  Black's Law Dictionary 1408-1409 (11th ed. 2019).[3]  Similarly, "control" can be the "direct or indirect power to govern the management and policies of a person or entity" or, more generally, "the power or authority to manage, direct, or oversee."  Id. at 416.

In considering the phrase "possession, custody or control," we note that our discovery rules "were created to permit defense counsel to learn, through discovery of the government's evidence, what the defendant faces in standing trial, and to assist in preventing trial by ambush."  Commonwealth v. Edwards, 491 Mass. 1, 8 (2022), quoting Commonwealth v. Eneh, 76 Mass.

---

[3] Black's Law Dictionary 1408 (11th ed. 2019) defines "possession" as:

"1.  The fact of having or holding property in one's power; the exercise of dominion over property.  2.  The right under which one may exercise control over something to the exclusion of all others; the continuing exercise of a claim to the exclusive use of a material object.  3.  Civil law. The detention or use of a physical thing with the intent to hold it as one's own. . . .  4.  (usu. pl.) Something that a person owns or controls. . . .  5.  A territorial dominion of a state or country."

App. Ct. 672, 677 (2010). See Commonwealth v. Frith, 458 Mass. 434, 439 (2010) ("The purpose of mandatory discovery is to encourage full pretrial discovery, increase what will be discovered by both sides, and promote judicial efficiency" [citation omitted]). Given the purpose of the rule, it is appropriate to take a comprehensive view of the phrase. Cf. Commonwealth v. Hanright, 465 Mass. 639, 641-643 (2013) ("examination" interpreted broadly under Mass. R. Crim. P. 14 [b] [2] [B]).[4]

The Commonwealth argues that because the statements at issue here were on a third-pary website, it did not control them. However, "[o]nce a third-party record is obtained by the Commonwealth . . . it becomes part of the prosecutor's case file, triggering discovery obligations." Commonwealth v. Kostka, 489 Mass. 399, 412 (2022). Although the record is silent as to the form the lyrics took,[5] the prosecutor obviously had access to the statements because she quoted from them during her cross-examination of the defendant. She also showed the defendant a photograph of the image that was displayed alongside

---

[4] We have done the same in the civil context. For example, we have interpreted the term "control" broadly under the analogous civil discovery rule. See Strom v. American Honda Motor Co., 423 Mass. 330, 341 (1996).

[5] At trial, the prosecutor indicated that she never downloaded the lyrics; however, during the cross-examination of the defendant she nevertheless quoted them verbatim.

one of his rap songs, mentioned supra.  In these circumstances, we consider the lyrics to have been in the prosecutor's files, in electronic form or otherwise; thus, the Commonwealth was obligated to disclose them under rule 14.[6]

Nevertheless, we further conclude that the judge did not err in denying the defendant's motion for a mistrial based on the Commonwealth's discovery violation.  "When the issue of the timeliness of disclosure is presented, we inquire whether 'the defendant is able to make effective use of the evidence in preparing and presenting the case.'"  Commonwealth v. Felder, 455 Mass. 359, 367 (2009), quoting Commonwealth v. Cronk, 396 Mass. 194, 200 (1985).  Where, as here, the defendant does not allege bad faith on the part of the prosecutor, we consider whether the discovery violation prejudiced the defendant. Commonwealth v. Nolin, 448 Mass. 207, 224 (2007).  "In measuring prejudice, it is the consequences of the delay that matter, not the likely impact of the nondisclosed evidence, and we ask

---

[6] The Commonwealth's additional arguments against disclosure similarly are unavailing.  The claim that by requiring such disclosure, the prosecution would be "required to track down and copy items of social media not already in its possession" is obviously incorrect based on the plain language of the rule. See Commonwealth v. Torres, 479 Mass. 641, 648 (2018) (if "[t]he district attorney does not have access to the [third-party's] files[,] . . . the practical indicia of the prosecutor's 'possession, custody, or control' are absent").  Moreover, disclosure of the defendant's statements alone cannot be considered protected work product, nor does such disclosure implicate the "best evidence" rule.

whether the prosecution's disclosure was sufficiently timely to allow the defendant to make effective use of the evidence in preparing and presenting his case" (quotations and citations omitted).  Id.  See Commonwealth v. Lao, 460 Mass. 12, 20 (2011).

Once the motion for a mistrial was denied, on redirect examination trial counsel elicited testimony from the defendant that he had been writing rap lyrics since junior high school, they were a form of art, and they were based on observations he has made but were not about him personally.  In doing so, the defendant effectively mitigated the negative effect of the Commonwealth's late disclosure.[7]  See Commonwealth v. Baldwin, 385 Mass. 165, 176 (1982); Commonwealth v. Cundriff, 382 Mass. 137, 151 (1980), cert. denied, 451 U.S. 973 (1981).  Moreover, the defendant obviously already was familiar with his own lyrics, making the timing of their disclosure unlikely to affect his ability to respond.  See Frith, 458 Mass. at 443, citing Commonwealth v. Schand, 420 Mass. 783, 789-790 (1995).  Finally,

---

[7] We note that trial counsel did not request additional time either to investigate or to prepare for redirect examination after the defendant's rap lyrics were raised by the Commonwealth.  See Commonwealth v. Emerson, 430 Mass. 378, 382 (1999), cert. denied, 529 U.S. 1030 (2000); Commonwealth v. Gilbert, 377 Mass. 887, 895-896 (1979).  Contrast Commonwealth v. Vaughn, 32 Mass. App. Ct. 435, 441-443 (1992) (abuse of discretion in denial of mistrial where defendant demonstrated that more time was needed to develop defense fully after late disclosure of evidence).

the defendant's claim that he might have decided not to testify had he known that the Commonwealth was going to cross-examine him with his rap lyrics is belied by his acknowledgement that his testimony -- the only evidence at trial supporting his theory of self-defense -- "was the single most important evidence" in his case.[8]  We conclude, therefore, that the defendant was not prejudiced by the Commonwealth's delayed disclosure.  See Cundriff, supra at 150 ("There is no showing that the defendant was significantly prejudiced at trial by the late disclosure of the statement or how a new trial would substantially cure any error").

b.  Admissibility of the lyrics.  As noted, when the prosecution questioned the defendant about several rap songs he had posted online, trial counsel objected.  The following day, counsel moved for a mistrial, arguing that the lyrics were irrelevant and highly prejudicial.  On appeal, the defendant renews this claim, arguing that his rap lyrics were inadmissible because they were not relevant to the case or, alternatively, if they were relevant, any possible probative value of the evidence was outweighed by the risk of unfair prejudice.

---

[8] The defendant also argues that had the prosecutor disclosed that he planned to use the defendant's lyrics, the defendant might have argued more effectively to exclude them. Because, as discussed in further detail infra, we conclude that the admission of the lyrics was not unduly prejudicial, this argument fails as well.

As discussed in more detail infra, we conclude that the defendant's rap lyrics were relevant for the purpose of rebutting the defendant's theory of self-defense.  However, they should have been analyzed as prior bad act evidence potentially admissible for a nonpropensity purpose.  See Mass. G. Evid. § 404(b)(2) (2023); Commonwealth v. Crayton, 470 Mass. 228, 249 n.27 (2014).  See also Mass. G. Evid § 403 note.  To the extent that any of the lyrics were found to be admissible, they should have been considered by the jury for the narrow purpose of determining whether the defendant truly believed the victim was carrying a firearm.  Although the foregoing is not the way the trial unfolded, we nonetheless conclude that the defendant was not prejudiced by the admission of his lyrics.

i.  Relevance.  In denying the defendant's request for a mistrial, the judge ruled that the defendant's rap lyrics were relevant to rebut the defendant's theory of self-defense.  The defendant argued that it was reasonable for him to assume that the victim had a gun at the park because the defendant had seen the victim's social media posts that depicted the victim with a gun.  In response, the Commonwealth offered the defendant's own posts, consisting of rap lyrics posted to YouTube, that also contained references to guns, to shed light on the sincerity of the defendant's concern that the victim possessed a gun.  The judge agreed that the lyrics were admissible in this limited

context.  See Commonwealth v. Adjutant, 443 Mass. 649, 654 (2005).

The defendant argues on appeal that the judge erred in finding the lyrics to be relevant because it was only in the context of their fight and the victim's threat that the defendant found the posts threatening, not the victim's posts in and of themselves.[9]  In other words, because he did not "react[] solely to violence-themed posts on social media," the defendant maintains that his own posts were irrelevant.  We do not agree.

We review a judge's determination of relevance for an abuse of discretion.  Commonwealth v. Andre, 484 Mass. 403, 414 (2020).  The threshold for determining whether evidence is relevant is a low one.  Commonwealth v. Gerhardt, 477 Mass. 775, 782 (2017).  The evidence "need not establish directly the proposition sought; it must only provide a link in the chain of proof."  Id., quoting Commonwealth v. Sicari, 434 Mass. 732, 750 (2001).  See Mass. G. Evid. § 401.  The defendant maintained that he was convinced the victim had a gun in part because he saw the victim's posts featuring guns.  However, the defendant himself also posted (lyrics) about guns and testified that they

_____

[9] The defendant's theory was that it was reasonable for him to believe that the victim was likely to use a gun based on the victim's statement, just prior to the physical altercation, in one of the victim's posts referencing what it feels like to get shot.

were not meant to be taken literally.  Thus, the defendant's own posts were probative of whether the victim's posts gave rise to an actual and reasonable fear that the victim had a gun.  The trial judge did not abuse his discretion in concluding that the defendant's own rap lyrics were relevant.[10]  See Commonwealth v. Teixeira, 486 Mass. 617, 627 (2021).

ii.  "Bad act" evidence.  Generally, relevant evidence is subject to exclusion "if its probative value is substantially outweighed by a danger of," among other things, "unfair prejudice."  Mass. G. Evid. § 403.[11]  However, when the relevant evidence in question is so-called "bad act" evidence, the test

---

[10] On appeal, the Commonwealth appears to argue for the first time that the defendant's lyrics were admissible because they were "likely literal."  However, there was no suggestion at trial that the defendant's lyrics had anything to do with the victim or that any of the acts mentioned in the lyrics had taken place (nor were they admitted on that basis).  Cf. Commonwealth v. Keown, 478 Mass. 232, 243 (2017) (admitting evidence of defendant's computer username based on "fictional criminal mastermind" for "limited purpose," i.e., not to show that defendant was, in fact, criminal mastermind).  Of course, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Mass. G. Evid. § 404(b)(1).  See Commonwealth v. Anestal, 463 Mass. 655, 665 (2012), quoting Commmonwealth v. Helfant, 398 Mass. 214, 224-225 (1986).

[11] Rule 403 of the Massachusetts Guide to Evidence states, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

for admissibility is more rigorous.  As an initial matter, although such evidence is not admissible to demonstrate the defendant's bad character or propensity to commit the crimes charged, see Mass. G. Evid. § 404(b)(1), it may be admissible for other purposes, including, as relevant here, the defendant's state of mind.  See Commonwealth v. Philbrook, 475 Mass. 20, 26 (2016); Mass. G. Evid. § 404(b)(2).  However, even if offered for a permissible purpose, bad act evidence nevertheless is inadmissible where "its probative value is outweighed by the risk of unfair prejudice to the defendant, even if not substantially outweighed by that risk."  Mass. G. Evid. § 404(b)(2).  See Crayton, 470 Mass. at 249 n.27.

The defendant argues that the lyrics should have been analyzed under the bad act evidence standard for admissibility. See Mass. G. Evid. § 404(b)(2).  The judge rejected this view on the basis that a song does not "qualif[y] as a bad act."  This is not necessarily so.

"The nature of so-called prior bad act . . . evidence . . . is that it reflects badly on the character of the defendant." Commonwealth v. Veiovis, 477 Mass. 472, 481 (2017).  "[O]ur focus is on whether the . . . evidence 'creates a risk that the jury will use the evidence impermissibly to infer that the defendant has a bad character or a propensity to commit the crime charged."  Commonwealth v. Valentin, 474 Mass. 301, 308

(2016), quoting Commonwealth v. McGee, 467 Mass. 141, 156 (2014). To this end, bad acts are not limited to unlawful acts. Id. at 307. See, e.g., Commonwealth v. Lowery, 487 Mass. 851, 866 (2021) (analyzing "text messages contain[ing] vulgar sexual references" as bad act evidence); Commonwealth v. Chalue, 486 Mass. 847, 866, 870 (2021) (analyzing membership in Aryan Brotherhood, drawings of human dissections, and photographs of weapons as bad act evidence).

As the Supreme Court of New Jersey aptly put it:

To be sure, writing rap lyrics -- even disturbingly graphic lyrics . . . -- is not a crime. Nor is it a bad act or a wrong to engage in the act of writing about unpalatable subjects, including inflammatory subjects such as depicting events or lifestyles that may be condemned as anti-social, mean-spirited, or amoral. However, the very purpose of Rule 404(b) is simply to keep from the jury evidence that the defendant is prone to commit crimes or is otherwise a bad person, implying that the jury needn't worry overmuch about the strength of the government's evidence" (quotations and citations omitted).

State v. Skinner, 218 N.J. 496, 517 (2014). In short, "[r]ule 404(b) serves as a safeguard against propensity evidence that may poison the jury against a defendant." Id.

Although rap lyrics do not qualify as bad act evidence,[12] here, the defendant's lyrics conveyed ideas or acts that

---

[12] We have considered rap lyrics to be bad act evidence on at least one other occasion. See Commonwealth v. Gray, 463 Mass. 731, 743-744, 752-753 (2012) (music appearing to demonstrate evidence of gang membership treated as bad act evidence).

themselves could be considered bad acts and therefore could reflect poorly on his character. Some of the lyrics at issue here arguably describe committing crimes, including: "[l]iving this [l]ife of [c]rime"; "being at war with the north"; "[f]riends [t]urn to [e]nemies, [e]nemies [t]urn to [m]emories"; and "I love my Glock, pop, now you're dead." Other lyrics were less explicit, but equally likely to "paint the defendant as a violent person of bad character," Commonwealth v. Santos, 463 Mass. 273, 296 (2012), citing Commonwealth v. Barrett, 418 Mass. 788, 793 (1994), including: "the [p]olice [c]an't [s]top [u]s"; and "I keep my weapons everywhere in the field." Because the defendant was on trial for murder, the rap lyrics he wrote referencing violence, possible gang affiliation, and killing enemies with guns should have been analyzed as bad act evidence under Mass. G. Evid. § 404(b) to determine admissibility.

Indeed, each of the lyrics sought to be admitted should have been scrutinized separately to weigh prejudicial impact against probative value. See Commonwealth v. Peno, 485 Mass. 378, 393-394 (2020). If the probative value of a particular lyric was outweighed by the risk of unfair prejudice (even if not substantially so), the lyric should have been excluded from evidence. See Mass. G. Evid. § 404(b)(2).

There is unique potential for prejudice when using "the inflammatory contents of a person's form of artistic self-

expression" "without a strong connection to the" facts of a given case.  <u>Skinner</u>, 218 N.J. at 524-525.[13]  That is true especially when such thematic art is used as evidence in a criminal trial where violence is alleged, but where there is no factual link between the art and the alleged conduct.  See <u>Commonwealth</u> v. <u>Gray</u>, 463 Mass. 731, 754 & n.23 (2012).

This risk is exacerbated by realities that we cannot ignore, namely, that rap historically has been used, by Black Americans especially, to give voice to observations of violence, poverty, and crime -- frequently irrespective of the rapper's own involvement -- as "a form of political expression."  <u>Gray</u>, 463 Mass. at 755 n.24, citing Dennis, Poetic (In)justice?  Rap Music Lyrics as Art, Life, and Criminal Evidence, 31 Colum. J.L. & Arts 1 (2007).  See Dennis, <u>supra</u> at 20-21.  Moreover, in the context of criminal prosecution, it is difficult to separate the fact that Black Americans and other people of color disproportionately are overrepresented in the criminal legal

---

[13] See <u>United States</u> v. <u>Gamory</u>, 635 F.3d 480, 493 (11th Cir.), cert. denied, 565 U.S. 1080 (2011) (lyrics that "contained violence" and "could reasonably be understood as promoting a violent and unlawful lifestyle" were "heavily prejudicial"); <u>State</u> v. <u>Cheeseboro</u>, 346 S.C. 526, 550 (2001), cert. denied, 535 U.S. 933 (2002) ("general references glorifying violence" were "far outweighed by . . . unfair prejudicial impact as evidence of appellant's bad character, i.e., his propensity for violence in general").

system[14] at the same time that rap music and its practitioners more likely are to be viewed negatively and as inherently violent or dangerous.[15]

Courts in some jurisdictions have suggested that to be admitted in evidence, rap lyrics must have "a strong nexus" to the issues to be decided in the case.  See Montague v. State, 471 Md. 657, 679 (2020) (both "nexus to the details" of alleged crime and "temporal nexus" are necessary); Skinner, 218 N.J. at 500 (artistic "self-expression" must have "a strong nexus between the specific details of the artistic composition and the circumstances of the underlying offense" to be admissible). This "nexus" can be direct -- where rap music or lyrics recount key details of the events in a case -- or indirect -- where a defendant expresses through music evidence of knowledge, a motive, or another relevant fact in dispute, even though the music is not a literal account of events that took place.[16]  We

---

[14] See generally E.T. Bishop, B. Hopkins, C. Obiofuma, & F. Owusu, Criminal Justice Policy Program, Harvard Law School, Racial Disparities in the Massachusetts Criminal System (Sept. 2020); Commonwealth v. Sweeting-Bailey, 488 Mass. 741, 757-758 (2021) (Wendlandt, J., concurring), cert. denied, 143 S. Ct. 135 (2022); id. at 770 & n.9 (Budd, C.J., dissenting); Commonwealth v. Long, 485 Mass. 711, 716-717 (2020), and cases cited.

[15] See generally Dunbar, Kubrin, & Scurich, The Threatening Nature of "Rap" Music, 22 Psychol., Pub. Pol'y, & L. 280, 288-290 (2016).

[16] See United States v. Moore, 639 F.3d 443, 447-448 (8th Cir. 2011) (admitting rap lyrics as evidence of knowledge of

adopt this individualized approach to determining the admissibility of rap lyrics.

Once bad act evidence is determined to be admissible, however, it is important for the jury to understand how it may be used in determining the facts of the case by way of limiting instructions.[17]  See McGee, 467 Mass. at 158 ("Often a limiting instruction is required as to the proper use of such evidence to ensure that its probative value outweighs the danger of unfair prejudice").  Cf. Commonwealth v. Forte, 469 Mass. 469, 480-481 (2014) (bad act evidence "served a limited and probative purpose of illustrating the defendant's angry state of mind" and "the jury were instructed on numerous occasions regarding the limited purpose").

Here, because the judge did not consider the lyrics to be bad act evidence, the statements were not analyzed under § 404(b)(2).  Some of the lyrics that the jury heard, including

_____

drug "prices" and "code words"); United States v. Foster, 939 F.2d 445, 456 (7th Cir. 1991) (rap containing "drug code words" admissible to show knowledge of drug trade, not to show that defendant "was the character portrayed in the lyrics").

[17] Although there generally is "no requirement that the judge give limiting instructions sua sponte," Commonwealth v. Cruzado, 480 Mass. 275, 279 (2018), quoting Commonwealth v. Sullivan, 436 Mass. 799, 809 (2002), we have said that where "the risk of unfair prejudice is apparent . . . contemporaneous limiting instructions are much to be preferred," even "if a defendant does not request them" (citations omitted).  Peno, 485 Mass. at 395-396.

those hightlighting living a life of crime, neighborhood wars, and disliking the police, hardly were probative of the defendant's self-defense claim.  Given their inflammatory themes, these lyrics could serve only to create an impression that the defendant was of poor character.  See Santos, 463 Mass. at 296, citing Barrett, 418 Mass. at 793.

Other lyrics penned by the defendant, including "I love my Glock, pop, now you're dead," properly may have been admitted to help the jury determine whether the defendant actually believed that the victim had a gun in his backpack.  However, without limiting instructions, the risk was too great that the jury may have considered it (improperly) as propensity evidence as well.  See Crayton, 470 Mass. at 249, citing Commonwealth v. Anestal, 463 Mass. 655, 665 (2012).  See also Peno, 485 Mass. at 398.  In the absence of an instruction as to how the jury could consider the lyrics, their probative value was outweighed by their prejudicial effect.  See Commonwealth v. Facella, 478 Mass. 393, 407 (2017).

iii.  Prejudice.  As the defendant timely objected to the introduction of the rap lyrics, we review the ruling for prejudice.  Anestal, 463 Mass. at 672.  "An error is nonprejudicial only if we are convinced that the error did not influence the jury, or had but very slight effect" (quotations and citations omitted).  Peno, 485 Mass. at 399-400.  A number

of factors may be taken into consideration in making this determination, including, but not limited to, the frequency of the improper references; whether the error was central to the trial; the strength of the Commonwealth's case; whether limiting instructions mitigated the error; and whether the jury were able to sort between the permissible and impermissible evidence such that the defendant was not prejudiced by the error.  See Anestal, supra at 672-673; Commonwealth v. Santiago, 425 Mass. 491, 500-501 (1997), S.C., 427 Mass. 298 and 428 Mass. 39, cert. denied, 525 U.S. 1003 (1998), and cases cited.

Here, we conclude that the error did not prejudice the defendant.  Although the prosecutor questioned the defendant extensively on his lyrics during cross-examination, she did not mention them in her opening statement or closing argument.  See Commonwealth v. Rutherford, 476 Mass. 639, 649 (2017), citing Commonwealth v. LeBeau, 451 Mass. 244, 261 (2008).  Unlike in other cases, the lyrics did not pervade the trial.  See, e.g., Anestal, 463 Mass. at 672-673 (reversal where bad acts were "repeatedly introduced, through three separate witnesses, in significant detail").

Further, the defendant's self-defense claim only partially hinged on his perception of the victim's posts.  Indeed, he still was able to testify in full to his basis for fearing the victim; that is, his defense was still viable after his own rap

lyrics were admitted.[18]  Contrast Commonwealth v. Santos, 460
Mass. 128, 129, 136-138 (2011) (prejudicial error where judge
erroneously excluded most compelling evidence of self-defense).
Moreover, on redirect, the defendant's testimony may have
blunted the prejudicial effect of the lyrics when he explained
that his lyrics and music were a "form of art" and his way "to
express the community around me" and "not me, personally."  See
Commonwealth v. Mason, 485 Mass. 520, 535 (2020) (risk of
prejudice effectively mitigated on cross-examination).

In addition, the Commonwealth's case was strong.  See
Commonwealth v. Martinez, 431 Mass. 168, 174 (2000) (although
witness's testimony regarding defendant's inculpatory statements
and behavior "was important to the Commonwealth's case, it was
not indispensable").  There was no question that the defendant
killed the victim; instead, the prosecution needed only to prove
that he did so without justification.  Although the defendant
claimed to have acted in self-defense, his version of the fight
was inconsistent with the accounts provided by other
eyewitnesses who testified.  For example, the defendant
testified that when police arrived, he started to run away and
the victim grabed him.  However, one of the responding officers

---

[18] As discussed infra, the jury were persuaded, at least in
part, by the defendant's testimony that he acted in self-
defense.

testified that when the police arrived, the sirens had no effect on the defendant, who had the victim "bent over, [with his] shirt[] completely over his head, so that he can't see or move, and [the defendant] was . . . giving him uppercuts to the body." Another witness stated that when the victim was "dazed," the defendant pulled the victim's shirt over his head and stabbed his chest, throat, and arm. The medical examiner testified that the victim was stabbed twelve times. The defendant, on the other hand, sustained only a cut on his thumb as a result of the attack.

Additionally, although the judge did not give limiting instructions when the lyrics were admitted, prior to deliberations he instructed the jury to "act without bias or prejudice" and cautioned twice that they were not to be swayed by emotions or sympathy for either side.

Finally, the jury's nuanced verdict suggests that they did not consider the defendant's rap lyrics as evidence of his character or propensity to commit crime. That is, the jury did not adopt the Commonwealth's theory of the case and instead apparently credited much of the defendant's testimony, including that he acted in self-defense (but that he used excessive force in doing so). See Commonwealth v. Bois, 476 Mass. 15, 35 (2016) (in acquitting on two charges and returning lesser verdict on another "the jury did not blindly accept the prosecutor's

arguments"). Given all of the above, we conclude that the defendant was not prejudiced by the references to his rap lyrics.

2. References to the defendant's prearrest silence. At trial, the prosecutor made a number of references to the fact that the defendant failed to inform police that he had stabbed the victim in self-defense. The defendant now contends that these references amounted to reversible error. As discussed infra, a defendant's prearrest silence is admissible in very limited circumstances; substantive evidence of consciousness of guilt is not one of them. Commonwealth v. Pierre, 486 Mass. 418, 433 (2020).

As we have observed on more than one occasion, "there may be many reasons why a defendant does not wish to come forward and speak to the police that have no bearing on his [or her] guilt or innocence." Commonwealth v. Gardner, 479 Mass. 764, 769 (2018). In the event that a defendant takes the stand, however, prearrest silence may be used to impeach his or her credibility. See Pierre, 486 Mass. at 433; Gardner, supra at 768-769. That is, the Commonwealth may raise the defendant's prearrest silence to show that, if the circumstances were as the defendant described them to be, it would be "natural" for the defendant to have said something at or near the time of the

event.[19]  Gardner, supra at 769-770, citing Commonwealth v.

Nickerson, 386 Mass. 54, 62 (1982).

For example, in Commonwealth v. Barnoski, 418 Mass. 523,

534 (1994), where the defendant claimed to have witnessed his

friend get shot, we concluded that the Commonwealth was

permitted to question the defendant as to why he did not attempt

to contact authorities to get help for his friend.  In that

case, "there was . . . immediate danger to another that could

have created an incentive to contact the police to get help."

Pierre, 486 Mass. at 434, citing Barnoski, supra at 534.

Here, the prosecutor asked a series of questions about the

defendant's failure to contact police regarding the fight.  In

particular, the prosecutor asked the defendant why, if he had

acted in self-defense, he had not (1) called police as he fled

the park, (2) reported to police that a gun was at the park, (3)

called police as he fled to a friend's house and later to Fall

River, or (4) answered the door when police arrived at his

location four days later.  The prosecutor also called to the

stand four officers who had responded to the scene and asked

---

[19] As a general matter, evidence of prearrest silence is of limited probative value as it pertains to a defendant's credibility.  See Gardner, 479 Mass. at 769.  Moreover, because jurors may "construe [prearrest] silence as an admission and, as a consequence, may draw an unwarranted inference of guilt," the admission of such evidence can be highly prejudicial.  Id., quoting Commonwealth v. Nickerson, 386 Mass. 54, 61 n.6 (1982).

whether the defendant sought to speak with any of them.[20]  The Commonwealth argues that the questions appropriately countered the defendant's claims that he went to the park because he believed his cousin was in danger, and that he stabbed the victim because he believed the victim had a gun in his backpack. We are not convinced.

The defendant had no obvious incentive to speak to police at the time of the incident or thereafter, as there was no immediate danger to his cousin or others and doing so "would have implicated him in the victim's death."  Gardner, 479 Mass. at 772.  Thus, referencing the defendant's prearrest silence was error.

Because trial counsel did not object to the questions asked of the defendant on cross-examination, we review the error there to determine whether there is a substantial risk of a miscarriage of justice, i.e., "a serious doubt whether the result of the trial might have been different had the error not been made."  Commonwealth v. Brown, 479 Mass. 600, 610 (2018), quoting Commonwealth v. Dirgo, 474 Mass. 1012, 1016 (2016). Trial counsel did object to a question put to one of the

---

[20] Although the defendant claims that the prosecutor also referenced the defendant's prearrest silence in her closing argument, the comment of which he complains referred to his flight from the area, not his silence, and was based on a statement he made on direct examination.

responding officers.  The objection was overruled.  We therefore review that question for prejudicial error; that is, whether the error "did not influence the jury, or had but very slight effect."  Peno, 485 Mass. at 399, quoting Commonwealth v. Vinnie, 428 Mass. 161, 163 (1998).  See Commonwealth v. Griffith, 45 Mass. App. Ct. 784, 785 n.2 (1998).  Under either standard, we ask whether the references to the defendant's prearrest silence improperly led the jury to ascribe "consciousness of guilt" to the defendant.  Pierre, 486 Mass. at 433.  See Gardner, 479 Mass. at 769, quoting Nickerson, 386 Mass. at 61 n.6 (jurors "may draw an unwarranted inference of guilt").

Where there is other, properly admitted evidence of consciousness of guilt, e.g., flight, or where the improper references to prearrest silence are duplicative of proper evidence, a substantial risk of a miscarriage of justice is unlikely.  See Pierre, 486 Mass. at 434-435 (because of other evidence of flight, no substantial likelihood of miscarriage of justice); Gardner, 479 Mass. at 775, citing Commonwealth v. Cassidy, 470 Mass. 201, 217 (2014) (because of "his flight, [and] efforts to hide," no substantial likelihood of miscarriage of justice in references to defendant's prearrest silence); Commonwealth v. Niemic, 472 Mass. 665, 673 (2015), S.C., 483 Mass. 571 (2019) (no substantial likelihood of miscarriage of

justice where improper questions about absence of self-defense explanation in prearrest statements "added little, if anything" to other, properly admitted statements).

Here, during direct examination the defendant testified that he left the area for Fall River for several days and, when police arrived at his location, he hid in a bathroom. In addition, trial counsel asked the defendant twice why he did not contact police. Thus, the questions the prosecutor subsequently asked the defendant on cross-examination regarding his prearrest silence, although improper, elicited testimony that was somewhat duplicative of that which the defendant had provided on direct.

Finally, the fact that the defendant was convicted of manslaughter, rather than murder in the first degree, was an indication that the jury accepted that the defendant's testimony that he, in fact, did act in self-defense. There was no substantial risk of a miscarriage of justice as a result of the prosecution's references to, or unobjected-to questions about, the defendant's prearrest silence. Contrast Commonwealth v. Irwin, 72 Mass. App. Ct. 643, 654-655 (2008) (substantial risk of miscarriage of justice where "there was no corroborating evidence or eyewitness testimony," Commonwealth focused on prearrest silence in closing, and defense had not offered similar evidence). Nor did the one question to which trial counsel did object, regarding the defendant's prearrest silence,

amount to prejudicial error on its own. See Commonwealth v. Gonzalez, 68 Mass. App. Ct. 620, 631-632 (2007) (no prejudice where "the jury's attention had been drawn to the defendant's . . . prearrest behavior by the defense" and where "[t]he reference to the issue was brief" and "evidence of guilt . . . was strong"); Commonwealth v. Martinez, 53 Mass. App. Ct. 327, 330-331 (2001).

3. Juror issue. The defendant contends that a juror made comments indicating that she was no longer impartial and that the judge abused his discretion by allowing her to remain on the jury. See Commonwealth v. Colon, 482 Mass. 162, 168 (2019), and cases cited. This argument is unavailing.

On the seventh day of trial, a court officer informed the judge that a juror had reported that individuals in the court room gallery were "staring" in "what may have been an intimidating manner," and that after court proceedings, a court spectator who had been sitting across from the jury box "pulled up alongside [another juror's] vehicle," "made eye contact with [her], pointed at [her], and then drove off."[21] As a result of these reports, the judge conducted an individual voir dire of each juror to determine whether they had experienced, heard about, or been affected by any of these events.

---

[21] The court room in which the trial was held had some gallery seating directly across from and facing the jury box.

During questioning, thirteen of the sixteen jurors reported members of the audience "staring" or "looking intently" at jurors during the trial.  Most did not personally observe this behavior, but stated they learned of it through other jurors.  The judge asked each juror whether he or she could continue to serve as a juror in a fair and impartial manner.  Based on their answers, the judge found fourteen of the sixteen jurors to be "indifferent" with no objection from either party.  See Commonwealth v. Williams, 481 Mass. 443, 447 (2019).  One juror, who indicated that she could remain impartial despite the incidents, nevertheless was excused "out of an abundance of caution" because she expressed safety concerns.

Juror no. 16, who reported observing more than one spectator "looking intently" at herself and at other members of the jury, indicated that she could remain fair and impartial, and denied fearing for her safety.  As a result of concerns that trial counsel expressed about the juror believing that the staring spectators were affiliated with the defendant, the judge asked the juror additional questions to probe her impartiality:

> The judge:  "[D]o you think consciously or subconsciously the fact that somebody is sitting across from the jury box and staring at the jury who may be affiliated with the defendant would again affect in any way, creep into any of your thinking as to whether this defendant is guilty of the crimes in which he is charged?"

The juror:  "I am waiting until I have all the evidence put in front of me, basically.  I'm not going to worry about, I can't worry about that."

The judge:  "You can't worry about that meaning you can't worry about someone in the spectators' gallery."

The juror:  "I am assuming that anything, if anything ever did happen people here would be taking care of it, because I would be telling you.  I would say I feel uncomfortable."

The judge:  "And do you feel uncomfortable?"

The juror:  "I'm fine."

The judge:  "You're fine?"

The juror:  "Yeah."

The judge:  "So it doesn't cause you any discomfort?"

The juror:  "Not at the moment.  I will tell you if it does."

. . .

The judge:  "Again, you're comfortable that you can and will be fair and impartial --"

The juror:  "Yes."

The judge:  "-- irrespective of the fact that you think maybe somebody --"

The juror:  "I don't think he's going to be out there.  I don't know if he's trying to intimidate me but I'm not going to be intimidated."

The judge:  "I'm going to ask you to step back for a moment."

The juror:  "All right."

Although trial counsel expressed no concerns along these lines at trial, the defendant now claims that the judge abused

his discretion in refusing to remove juror no. 16 because the juror expressed antagonism and bias toward the defendant during the voir dire.  More specifically, the defendant contends that the juror was referring to the defendant when she said:  "I don't think he's going to be out there.  I don't konw if he's trying to intimidate me but I'm not going to be intimidated."  The defendant contends that the statement showed that the juror felt safe because the defendant would be found guilty and therefore would be incarcerated.

This argument is based on an obvious misreading of the transcript.  It is clear from the context of the exchange that when the juror said "he," she was referring not to the defendant but instead to the spectator in the courtroom gallery who had been was staring at her and other jurors.

After questioning the juror extensively, the judge determined that the juror would follow his instructions not to draw any inferences with regard to any of the spectators, and that she would base her verdict solely on the evidence presented at trial.  See Philbrook, 475 Mass. at 31, citing Commonwealth v. Guisti, 434 Mass. 245, 254 (2001), S.C., 449 Mass. 1018 (2007).  There was no abuse of discretion.  See Colon, 482 Mass. at 168, citing Philbrook, supra at 31 ("Where a judge conducts individual voir dire of each juror, excuses all influenced jurors, and determines that the remaining jurors are impartial,

a defendant's right to an impartial jury has not been violated").

4. Jury instructions on excessive force in self-defense. Reciting the Model Jury Instructions on Homicide 80-82 (2018) almost word-for-word, the judge instructed the jury that "'excessive force' in self-defense means that considering all of the circumstances, the defendant used more force than . . . was reasonably necessary to defend himself."  The defendant argues that Commonwealth v. Kendrick, 351 Mass. 203 (1966), the case from which the model instruction is derived, has been misinterpreted, and that, in fact, "excessive force" instead should be defined as "substantially more force than was reasonably necessary" (emphasis added).  Not so.

In Kendrick, 351 Mass. at 211, "excessive force" is described as "unreasonable and clearly excessive in light of the existing circumstances" or "manifestly disproportionate."  The court makes clear in Kendrick that where a defendant claims self-defense, the question to be decided by the jury is whether the amount of force used was reasonable.  Id. at 211-212.  This concept has remained unchanged since Kendrick was decided.  See, e.g., Commonwealth v. Santos, 454 Mass. 770, 773 (2009); Commonwealth v. Boucher, 403 Mass. 659, 663 (1989); Commonwealth v. Harris, 376 Mass. 201, 208-209 (1978), S.C., 487 Mass. 1016 (2021).  Indeed, we have noted that "a single punch in response

to a single punch" may be "unreasonable in the circumstances." Commonwealth v. King, 460 Mass. 80, 85-86, 89 (2011).

Adding "substantially" to the phrase "more force than was reasonably necessary" would change the meaning of "excessive force" as we have defined it in our case law.  We decline to do so.

5.  Cumulative effect of errors.  Finally, the defendant argues that in the absence of individual reversible error, the cumulative effect of the errors at trial created a substantial risk of a miscarriage of justice because nearly all of them[22] concerned his credibility and the question whether he used excessive force in self-defense.  See, e.g., Commonwealth v. Dwyer, 448 Mass. 122, 138-139 (2006); Commonwealth v. Yang, 98 Mass. App. Ct. 446, 454 (2020).  We disagree.

The trial errors we detected, i.e., a discovery violation relating to, and the admission of, the defendant's lyrics, and the admission of the defendant's prearrest silence, did not in combination create a substantial risk of a miscarriage of justice.  As discussed supra, the jury apparently believed that the defendant acted in self-defense.  The question whether he used excessive force is a separate one that did not hinge solely

---

[22] The defendant does not count the so-called biased juror claim as affecting the excessive use of force issue.  In any event, as indicated supra, we conclude that the juror claim is without merit.

on the defendant's credibility.  Contrary to other cumulative error cases, the Commonwealth's case was not "word against word," Commonwealth v. Mazzone, 55 Mass. App. Ct. 345, 353 (2002), quoting Commonwealth v. Dion, 30 Mass. App. Ct. 406, 415 (1991), but relied on, among other things, the extent of the victim's injuries, the fact that the defendant was not injured when found, and numerous eyewitness accounts contradicting the defendant's account of the fight.  That the defendant's account was still credited in large part demonstrates that, in the context of the entire trial, there was no substantial risk of a miscarriage of justice.  See Commonwealth v. Russell, 439 Mass. 340, 351 (2003).

Judgment affirmed.